915 A.2d 65 (2007)
390 N.J. Super. 238
Jason CUTLER, Plaintiff-Appellant/Cross-Respondent,
v.
Theodore DORN, Robert Shreve, Defendants-Respondents, and
Borough of Haddonfield, Defendant-Respondent/Cross-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued November 28, 2006.
Decided February 2, 2007.
*67 Clifford Van Syoc, Cherry Hill, argued the cause for appellant/cross-respondent Jason Cutler.
*68 William M. Tambussi argued the cause for respondent Theodore Dorn (Brown & Connery, attorneys; Mr. Tambussi and Louis R. Lessig, Westmont, on the brief).
F. Herbert Owens, III, Philadelphia, PA, argued the cause for respondent Robert Shreve (Sweeney & Sheehan, attorneys; Mr. Owens, on the brief).
Mario A. Iavicoli, Haddonfield, argued the cause for respondent/cross-appellant Township of Haddonfield.
Before SKILLMAN, LISA and GRALL.
The opinion of the court was delivered by
LISA, J.A.D.
Plaintiff, Jason Cutler, a Jewish police officer in the Borough of Haddonfield, brought this action under the Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, against Haddonfield, its former Director of Public Safety, Theodore Dorn, and plaintiff's fellow police officer, Robert Shreve. Plaintiff claimed defendants created, perpetuated and failed to remediate a hostile work environment based upon plaintiff's religion or ancestry. Further, although not alleged in his complaint, plaintiff was permitted to present an additional claim that his promotion to corporal was delayed in retaliation for bringing this action or because of his religion or ancestry.
The claims against Shreve and Dorn were dismissed on motion, respectively, at the commencement of and during trial. The jury found that plaintiff proved he was subjected to a hostile work environment based upon his religion or ancestry and that Haddonfield was liable for that environment. However, the jury awarded zero damages and found that the delay in promotion to corporal did not occur as a result of plaintiff's religion or ancestry or in retaliation for his complaint. The jury also declined to assess punitive damages against Haddonfield.
Plaintiff appeals on various grounds, which we will set forth with particularity in Part IV of this opinion. Haddonfield cross-appeals from the portion of the judgment reflecting the jury's finding that plaintiff was subjected to a hostile work environment, within the meaning of the LAD. We agree with Haddonfield's argument and reverse on the cross-appeal. As a result, many of plaintiff's arguments are moot, and we reject plaintiff's remaining arguments. Accordingly, we affirm on plaintiff's appeal.

I.
Plaintiff became a member of the Haddonfield Police Department in 1995. He and Shreve attended the police academy together. Shreve's father was an instructor at the academy and a close friend of Dorn, who was one of three elected commissioners constituting Haddonfield's governing body. Dorn knew Shreve since birth, and Shreve referred to Dorn as Uncle Ted.
Plaintiff and Shreve were not particularly friendly with each other. They each primarily associated with a different group of colleagues within the Department. The incident that precipitated this litigation occurred on April 18, 1999. At that time, Dorn was serving as Haddonfield's Public Safety Director, a part-time assignment held by one of the commissioners, a position which was also part-time in this small community. While on duty and in the stationhouse, plaintiff, Shreve and then Corporal Mark Knoedler were about to view a diplomatic immunity video. Shreve questioned why they would watch such a tape. Knoedler responded it was probably because the Macabee games were then being held in the neighboring community of Cherry Hill. Plaintiff explained that the *69 Macabee games were the Jewish Olympics. Plaintiff thought he heard Shreve blurt out, "Those dirty Jews." Plaintiff looked at Shreve disapprovingly. Shreve attempted to amend his statement to those "sturdy Jews."
After the video ended, plaintiff said nothing to Shreve, but informed Knoedler of his displeasure with Shreve's comment. Knoedler went to Shreve, told him his remark was very insensitive and that he should apologize to plaintiff. Within one-half hour, Shreve contacted plaintiff and requested that they meet. They did so, and during a five or six minute discussion, Shreve apologized. Plaintiff told Shreve the comment was inappropriate and he did not consider it a joke.
The same day, Knoedler went to the home of Lieutenant Richard Tsonis and reported the incident. Tsonis directed Knoedler to prepare a report of the incident, which he promptly did. On April 21, 1999, Knoedler asked plaintiff whether he wished to file a complaint. Plaintiff was somewhat reluctant to do so because he knew of the close friendship between Shreve and Dorn, which he thought could jeopardize his career. Nevertheless, plaintiff prepared a complaint and submitted it that evening. The complaint described Shreve's comment as "Those dirty Jews!" and noted Shreve's attempt to correct the statement to "sturdy Jews." In his complaint, plaintiff stated that Shreve told him "he thought we were friendly enough to joke around about these things," and that plaintiff "believe[d] that Ptlm. Shreve felt these comments were harmless humor." Nevertheless, plaintiff "expressed [his] distaste for [Shreve's] sense of humor," and, for the first time, reported that others in the Department had been insulting towards his heritage and he related several specific examples.
The Department immediately initiated an Internal Affairs investigation. The Department also notified the county prosecutor's office of the incident. The prosecutor's office eventually advised the Department that it found no basis for criminal charges and the matter should be handled administratively. On May 19, 1999, the Internal Affairs investigation resulted in a recommendation that Shreve be issued a letter of counseling explaining the inappropriateness of his action and advising him that such behavior would not be tolerated in the future. It was also recommended that Shreve receive sensitivity training. The Captain and Chief of Police issued their concurrences with the recommendation. It then went to Dorn, who accepted the recommendation.
At no time after April 18, 1999 did Shreve ever make any derogatory or inappropriate comment to plaintiff or about him or about members of the Jewish faith.
On July 9, 1999, plaintiff was in attendance as an observer at an unrelated disciplinary hearing involving another officer in the Department. Shreve was a witness and, in the course of his testimony described his April 18, 1999 comment in plaintiff's presence as follows: "Let's get rid of all those dirty Jews." At the trial of this case, Shreve said his testimony at the disciplinary hearing was mistaken, and that his remark on April 18, 1999 was indeed, "Those dirty Jews" which he admittedly attempted to correct to "sturdy Jews." Shreve categorized his remark as "stupid locker room humor" which "was incredibly insensitive and foolish."
When plaintiff heard Shreve's testimony at the disciplinary hearing on July 9, 1999, his displeasure with Shreve's comment deepened. In plaintiff's view, the expanded version of the comment was significantly more egregious, suggesting the advocation *70 of genocide. Plaintiff has lost many relatives in the Holocaust. On July 9, 1999, after hearing Shreve's testimony, plaintiff consulted counsel, who filed a tort claim notice that day and filed this suit several days later.
In his complaint, in addition to Shreve's comment, plaintiff alleged several other incidents, previously unreported, that he contended contributed to the hostile work environment based upon his religion or ancestry. In 1996, someone placed a sticker of an Israeli flag on his locker, and about two weeks later, someone placed a sticker of a German flag above it. It became clear at trial that the sticker depicted the flag of the German Republic, not the Nazi regime. The complaint also alleged that since 1996, plaintiff was exposed to "anti-semitic comments, primarily by his superiors, such as making general slurs about Jewish people, referring to the alleged superior skills and abilities Jews possessed to make money, and other comparable derogatory comments." Plaintiff also alleged that during Passover in 1999, a co-worker wished him happy Passover, and there was some suggestion that plaintiff would or should wear a yarmulke. A superior officer advised plaintiff he would not be permitted to do so, because it would be a departure from the Department's uniform requirements.[1] Plaintiff further alleged that the investigation and disposition of the April 18, 1999 incident was inadequate and that, rather than being punished, Shreve was promoted to corporal soon after the incident, further indicating that Haddonfield did not take the incident seriously.
At trial, plaintiff presented evidence about the incidents described in the complaint and other incidents in an effort to prove the existence of a hostile work environment based upon his religion or ancestry. Before discussing the other incidents, we describe evidence presented by Haddonfield regarding the environment in which Shreve's comment of April 18, 1999 and the other incidents occurred. The environment provides context, which is legally significant, because the totality of the circumstances must be evaluated in any hostile work environment analysis.
During shift changes, officers engaged in considerable joking, laughing, and "breaking chops," as a tension breaker. Officers maintained in the Department a "humor file." The contents of this file were kept in two separate locked filing cabinets. Plaintiff had the key to one of them. Materials from the humor file were taken out and exchanged between officers or posted around the Department from time to time. Some of the materials in the humor file were of a racial or ethnic nature, directed at various groups.[2] Plaintiff participated in sharing these items and deriving humor from them. The use of these materials by all, including plaintiff, was good natured. Plaintiff acknowledged that he created some of the items in the humor file. Plaintiff acknowledged that "everyone took [the humor file] to be funny and no one took offense because it was not intended to be malicious and aimed at any one group." Some items in the humor file were directed at Jewish people. Plaintiff was aware of that, and never objected.
*71 In addition to the humor file, evidence was presented showing that plaintiff participated in ribbing directed at other Department members based upon their religion. For example, Knoedler was a born-again Christian. On one occasion, several officers wore yarmulkes in Knoedler's presence to get back at him for playing Christian music and preaching to other officers. Plaintiff acknowledged that he "probably" supplied the yarmulkes. Plaintiff also was present when officers asked Knoedler if he had attended church that day. Plaintiff did not find this conduct directed at Knoedler offensive.
As we have stated, until the April 18, 1999 comment by Shreve, plaintiff never objected to or complained about any comments pertaining to his Jewish religion or ancestry or about Jewish people generally.
Plaintiff presented the following additional evidence at trial in support of his hostile work environment claim. From May 1995 through January 1999, superior officers made comments about Jews in plaintiff's presence. The former chief, several times a month, asked plaintiff where his big "Jew nose was." On a few occasions, other officers commented that Jews are good with numbers and asked plaintiff why he was there rather than going into the family business, saying that "Jews make all the money." With respect to the Passover comment by a superior officer that plaintiff would not be permitted to wear a yarmulke because he would not properly be in uniform, plaintiff pointed out that, for a time, Knoedler wore a "Jesus First" pin on his uniform. However, at some point, Knoedler was ordered by his superiors to cease wearing the pin.
In the several months following April 18, 1999, three patrolman, including Shreve and plaintiff, were promoted to corporal. Shreve's promotion became effective on May 3, 1999, the other individual's on June 1, 1999, and plaintiff's on July 1, 1999. Plaintiff contended that his promotion was delayed fifty-seven days, and that Shreve and the other individual were placed ahead of him, because he was Jewish and because he had intimated to at least one superior officer that he might file suit.

II
When the trial was about to commence, the judge granted Shreve's motion for dismissal because he was plaintiff's co-employee, and not a supervisor. See Herman v. Coastal Corp., 348 N.J.Super. 1, 27-28, 791 A.2d 238 (App.Div.), certif. denied, 174 N.J. 363, 807 A.2d 195 (2002). During trial, Dorn's motion for involuntary dismissal was granted because of insufficient evidence that he aided and abetted in discriminatory conduct. See N.J.S.A. 10:5-12(e); Tarr v. Ciasulli, 181 N.J. 70, 83-84, 853 A.2d 921 (2004).
The jury found that plaintiff was subjected to a hostile work environment based on his religion or ancestry, and that Haddonfield was liable for that environment. The jury awarded zero damages and declined to award punitive damages. The jury found that Haddonfield did not delay plaintiff's promotion to corporal in retaliation for complaining of a hostile work environment or based on his Jewish religion or ancestry.
After trial, Dorn, Shreve and Haddonfield moved for imposition of fees and costs against plaintiff pursuant to N.J.S.A. 10:5-27.1. Haddonfield moved for judgment notwithstanding the verdict (nov) as to liability against it.
Plaintiff moved for entry of an award of nominal damages, a new trial on his retaliation, compensatory and punitive damages claims, and, in the alternative, additur. He also moved for counsel fees and costs pursuant to N.J.S.A. 10:5-27.1. Finally, he *72 moved for equitable relief, seeking an order requiring Haddonfield to remediate the hostile work environment.
After hearing extensive oral argument, the judge denied all of the motions by all parties and entered a judgment reflecting the jury's verdict. After plaintiff's motion for reconsideration was denied, the appeal and cross-appeal were filed.

III
We first address Haddonfield's cross-appeal. Haddonfield argues that the trial judge erred in failing to grant its motion during trial for dismissal and its post-trial motion for judgment nov, contending that the incidents portrayed in the evidence were not sufficiently severe or pervasive to make a reasonable Jewish person believe that the conditions of employment were altered and the working environment was hostile or abusive. In denying the motion for dismissal, the judge ruled that a jury question existed as to whether the incidents were sufficiently severe or pervasive under the LAD. Similarly, in denying Haddonfield's judgment nov motion, the judge found that sufficient evidence of a hostile work environment based upon religion or ancestry was presented to support the jury's finding, although he may not have agreed with the verdict had he been on the jury.
In denying Haddonfield's motion for judgment nov, the judge distinguished this case from Heitzman v. Monmouth Cty., 321 N.J.Super. 133, 728 A.2d 297 (App.Div. 1999), because, in this case, "there was a great . . . [anti] Semitic comment, if not said directly to the plaintiff, said within his presence." The judge acknowledged this was a "close case" but thought there had been sufficient evidence to submit it to the jury.
A motion for involuntary dismissal shall be "denied if the evidence, together with the legitimate inferences therefrom, could sustain a judgment in plaintiff's favor." R. 4:37-2. The oft-cited test set forth by the Supreme Court in Dolson v. Anastasia, 55 N.J. 2, 5-6, 258 A.2d 706 (1969) (citations omitted), is that
accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. The point is that the judicial function here is quite a mechanical one. The trial court is not concerned with the worth, nature or extent (beyond a scintilla) of the evidence, but only with its existence, viewed most favorably to the party opposing the motion.
The test applicable to involuntary dismissal motions is similarly applicable to judgment nov motions. Dolson, supra, 55 N.J. at 5, 258 A.2d 706.
We have recently set forth in detail the relevant principles pertaining to a hostile work environment claim because of one's religion in El-Sioufi v. St. Peter's University Hospital, 382 N.J.Super. 145, 887 A.2d 1170 (App.Div.2005). As to a plaintiff's burden:
In any LAD-based hostile environment claim, the plaintiff must demonstrate that: (1) the conduct complained of was unwelcome; (2) that it occurred because of the plaintiff's inclusion in a protected class under the LAD; and (3) that a reasonable person in the same protected class would consider it sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile, or offensive work environment. Our review of a hostile work environment claim requires us to *73 consider the totality of the circumstances.
[Id. at 178, 887 A.2d 1170 (citations omitted).]
The question presented in the case of a hostile work environment claim based upon religious discrimination is
whether a reasonable person of plaintiff's [religion or creed] would consider the alleged . . . comments made by or in the presence of plaintiff's supervisors to be sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment. Of course, a plaintiff must also show that the complained-of conduct . . . would not have occurred but for [his or her] [religion]. We evaluate severity and pervasiveness by considering the conduct itself rather than the effect of the conduct on any particular plaintiff.
[Id. at 178-79, 887 A.2d 1170 (citations and quotation marks omitted).]
Not every offensive utterance will give rise to a hostile work environment:
Although, because of the invidious nature of discrimination, it may be possible to infer an intent to discriminate, not every offensive remark, even if direct, is actionable. As we have held: epithets or comments which are "merely offensive" will not establish a hostile work environment claim. Instead, the [c]onduct must be extreme to amount to a change in the terms and conditions of employment. Thus,
whether an environment is "hostile" or "abusive" can be determined only looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance.
[Id. at 179, 887 A.2d 1170 (citations and some quotation marks omitted).]
On rare occasions a single comment will support an actionable claim:
A single comment, if sufficiently severe, may be enough to create a hostile working environment. The cases in which a single statement has sufficed for purposes of creating a triable question about hostile work environment, however, have uniformly involved an outrageous and offensive statement made by a supervisor directly to the complaining subordinate. . . .
Such a factual scenario is highly unusual. More frequently, as in Heitzman, supra, or Mandel [v. UBS/PaineWebber, Inc., 373 N.J.Super. 55, 860 A.2d 945 (App.Div.2004)], a plaintiff seeks to demonstrate that an environment is hostile by relying on a variety of statements or behaviors directed to plaintiff and others. As the Third Circuit has held, a hostile work environment claim will survive summary judgment:
if a plaintiff presents sufficient evidence to give rise to an inference of discrimination by offering proof that her workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.
[Id. at 179-80, 887 A.2d 1170 (citations and quotation marks omitted).]
In Heitzman, the plaintiff appealed from a grant of summary judgment which dismissed both counts of his LAD complaint, including the second count which alleged "he was subjected to a hostile work environment *74 because of a series of anti-Semitic comments." Heitzman, supra, 321 N.J.Super. at 137, 142, 728 A.2d 297. We recited the comments the plaintiff considered anti-Semitic:
Plaintiff testified [at his deposition] that when he told his supervisor, Dodig, and a coworker that he was going to the Catskills on his vacation, the coworker said, "Oh, the Jewish Alps." Plaintiff also alleged that when Dodig saw a load of yarmulkes spill out of a garbage truck, he laughingly referred to them as "all those skullcaps." On another occasion, a coworker who played golf complained that a particular country club "was barred to anyone but Jews." Plaintiff also testified that Dodig asked him whether he ate "ham, bacon or pork" and inquired several times about what he was doing on Friday nights. In addition, plaintiff overheard Dodig tell a coworker about a Jewish real estate salesman who tried to sell him a condominium which Dodig thought was close to the reclamation center. When Dodig asked the salesman whether the housing complex was "close to the dump," the salesman said it was a mile away, which Dodig laughingly described as "a Jewish mile." On another occasion, plaintiff overheard Dodig describe his own girlfriend as a "Jew bitch." Finally, a coworker named Kitzman once said to plaintiff: "[I]f Hitler was alive, he would make a lamp shade out of [you]."
[Id. at 143, 728 A.2d 297.]
In considering whether a reasonable person of plaintiff's ancestry could consider the comments "sufficiently severe or pervasive to alter the conditions of employment and create an intimidating, hostile or offensive working environment," id. at 147, 728 A.2d 297, we said:
Under this standard, a hostile work environment discrimination claim cannot be established by epithets or comments which are merely offensive. An employment discrimination law such as the LAD is not intended to be a general civility code for conduct in the workplace. [D]iscourtesy or rudeness should not be confused with racial [or ethnic] harassment, and a lack of racial [or ethnic] sensitivity does not, alone, amount to actionable harassment. Thus, simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment. [C]onduct must be extreme to amount to a change in the terms and conditions of employment. Ultimately, whether an environment is hostile or abusive can be determined only by looking at all the circumstances, which may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a merely offensive utterance; and whether it unreasonably interferes with an employee's work performance.
[Ibid. (citations and quotation marks omitted).]
In affirming the grant of summary judgment, with one judge dissenting, we held that "no reasonable trier of fact could conclude that the anti-Semetic comments which were allegedly made to the plaintiff by or in the presence of his supervisors were so severe or pervasive that a reasonable person of Jewish ancestry would believe that the conditions of employment had been altered and that the working environment was hostile or abusive." Id. at 147-48, 728 A.2d 297. We reasoned that
most of the comments upon which plaintiff grounds his hostile work environment discrimination claim, such as the inquiries about what he was doing on Friday nights and his dietary habits, the *75 reference to plaintiff's vacation destination as the "Jewish Alps," the comment about the country club which excluded non-Jews, and the characterization of Yarmulkes as "skullcaps," were at worst "teasing" remarks which were not sufficiently extreme to create an abusive or hostile workplace. His supervisor Dodig's characterization of his own girlfriend as a "Jew bitch" and his comment about a "Jewish mile" were both directed at other persons. Although a reasonable person of Jewish ancestry undoubtedly would find these comments to be offensive, a derogatory comment about another person generally does not have the same sting as an ethnic slur directed at a minority group member. Moreover, the comments were sporadic and casual, and did not involve any physical threat or humiliation or any direct interference with plaintiff's work performance.
[Id. at 148, 728 A.2d 297 (citations omitted).]
In determining whether comments create a hostile work environment, the nature of the environment is an important factor to be considered. As observed by the Supreme Court in Oncale v. Sundowner Offshore Servs. Inc., 523 U.S. 75, 81-82, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201, 208-09 (1998) (citations omitted):
We have emphasized, moreover, that the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." In same-sex (as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target. A professional football player's working environment is not severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field even if the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.
The Haddonfield Police Department is relatively small and had been populated by an "in-group" of officers and some supervisors who delighted in playing pranks, teasing, ribbing and "breaking each others chops." Plaintiff participated to at least some extent. Humor files, containing offensive material, were well known and made available for perusal for those who wished to indulge, including plaintiff.
Against this backdrop, Shreve, a co-worker whom plaintiff did not particularly like, made the "dirty Jews" comment in plaintiff's presence. While the comment was undoubtedly disturbing, it was isolated, not specifically directed at plaintiff, and not made by a supervisor. We do not view the comment, even in its expanded form, as comparable to that in Taylor v. Metzger, 152 N.J. 490, 495, 706 A.2d 685 (1998), where the Burlington County Sheriff, in the presence of a supervisor, referred to the African-American female plaintiff, a sheriff's officer, as a "jungle bunny" when the plaintiff greeted the Sheriff. The Supreme Court held:
Therefore, the fact that defendant uttered only one slur toward plaintiff does *76 not, as a matter of law, preclude his conduct from being extreme and outrageous. A single event, under the right circumstances, may be extreme and outrageous. Defendant's conduct in this case may present those unusual circumstances. In the presence of Undersheriff Isham, defendant, the Sheriff of Burlington County, referred to plaintiff, who had been a sheriff's officer for twenty years, as a "jungle bunny." In light of the potency of racial slurs and defendant's authority as sheriff, a jury could reasonably determine that defendant's conduct was extreme and outrageous.
[Id. at 512-13, 706 A.2d 685 (citation and quotation marks omitted).]
Nor do we find Shreve's comment, along with the various additional comments and incidents complained of, sufficient in the aggregate to support plaintiff's claim. The comments allegedly made by plaintiff's supervisors about plaintiff's Jewish nose or that Jews "make all the money" or Jews being good at math fall into the category of teasing. The anonymous placing of an Israeli flag on plaintiff's locker also smacked of teasing and, objectively, was an item of which plaintiff might well be proud. While the placing of a flag of modern Germany above the Israeli flag had some offensive implications, it was not a Nazi flag and was likely a prank concocted by plaintiff's friends. A supervisor telling plaintiff that he could not wear a yarmulke during Passover while on duty was not constitutionally impermissible. Goldman v. Weinberger, 475 U.S. 503, 106 S.Ct. 1310, 89 L.Ed.2d 478 (1986).[3] Parenthetically, it appears that plaintiff would not have worn one in any event. The incidents were infrequent. Until Shreve's comment, plaintiff never objected or complained, which is strong evidence that he acquiesced in the activities as part of the give-and-take in which he regularly participated.
Given the totality of the circumstances, the comments and pranks were sporadic and not sufficiently severe or pervasive to create a hostile work environment under the LAD. The totality of the conduct here, considered in the context in which it occurred, was less egregious than that in Heitzman. Haddonfield's motions to dismiss and for a judgment nov should have been granted. We therefore reverse that portion of the Final Judgment of April 11, 2003 that denied Haddonfield's motion for judgment nov.

IV
Plaintiff presents the following arguments on appeal:
I. PERMITTING DEFENSE COUNSEL TO MAKE FACTUALLY UNSUPPORTED ALLEGATIONS PORTRAYING PLAINTIFF AS A BIGOTED RACIST VIOLATED SUPREME COURT PRECEDENT AND DENIED PLAINTIFF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY JURY.
II. THE RESOLUTION OF THE MOTION TO BAR AN AUDIOTAPE RECORDING PROVING RETALIATORY REFUSAL TO PROMOTE WAS FUNDAMENTALLY UNFAIR AND UNJUST WHERE ADEQUATE NOTICE AND OPPORTUNITY FOR DISCOVERY WAS PROVIDED, AND NO SURPRISE OR PREJUDICE RESULTED.

*77 III. THE LAW DIVISION ERRED IN DISMISSING PLAINTIFF'S CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS.
IV. THE LAW DIVISION ERRED IN DENYING PLAINTIFF'S REQUEST FOR EQUITABLE RELIEF.
V. THE TRIAL COURT SHOULD HAVE ENTERED AN AWARD OF NOMINAL DAMAGES AND AN AWARD OF COUNSEL FEES.
VI. THE ORDER EXCLUDING THE TESTIMONY OF PLAINTIFF'S TREATING DOCTOR VIOLATED SUPREME COURT PRECEDENT ON POINT AND WAS ERROR.
VII. RECUSAL OF [THE TRIAL JUDGE] WAS REQUIRED AS A RESULT OF HIS PRIOR CONSULTATION WITH PLAINTIFF'S COUNSEL AS A PROSPECTIVE CLIENT IN THE CONTEXT OF AN EMPLOYMENT DISPUTE, COUPLED WITH THE OBJECTIVELY REASONABLE BELIEF BY CUTLER THAT THE PROCEEDINGS WERE UNFAIR.
VIII. PLAINTIFF'S COUNSEL SHOULD HAVE BEEN PERMITTED TO SUGGEST AN AMOUNT OF DAMAGES TO THE JURY.
In light of our disposition of Haddonfield's cross-appeal, Points III, IV, V, VI and VIII are moot, and we will not discuss them. The arguments raised in Points I and VII lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).
Plaintiff's remaining arguments pertain to denial of his motion to amend the complaint at the time of trial to add an additional claim and excluded evidence.
Plaintiff's complaint, filed on July 14, 1999, contained no claim of retaliation. Nearly two years later, in late April or early May 2001, plaintiff had a discussion with Tsonis, who was then Chief of the Department, regarding plaintiff's potential promotion to sergeant. Plaintiff secretly recorded the conversation. Tsonis told plaintiff he could not promote him to sergeant while this law suit was pending, although he wanted to promote him. Tsonis told plaintiff that "they" told him this promotion could not be made with the law suit going on, and he intimated that "they" might have referred to Dorn. A copy of the tape was sent to all counsel, and at plaintiff's January 23, 2002 deposition, the tape was played and plaintiff was questioned about it.
Tsonis was brought up on administrative disciplinary charges for lying to plaintiff during the taped conversation. In March 2002 Tsonis admitted to the charge of conduct unbecoming an officer and accepted a one-month suspension without pay.
When the case came on for trial in January 2003, Dorn moved to exclude the audiotape and evidence relating to the conversation between plaintiff and Tsonis. Plaintiff opposed the motion, contending the evidence was relevant to his hostile work environment claim and his unpleaded retaliation claim for his delayed corporal promotion. Plaintiff also sought to amend the complaint to add a claim of retaliation for non-promotion to sergeant. The judge granted Dorn's motion and denied plaintiff's.
The judge was of the view that the defense was not on notice of an intended additional claim for retaliatory non-promotion to sergeant and would need additional time to prepare to defend such a claim. The judge noted it would "change the entire complexion of the case." Addition of the claim would require evidence of all of the considerations that entered into promoting a different individual (apparently an African-American) rather than plaintiff *78 to sergeant, a comparison of their qualifications, any testing procedures, recommendations, and the like that entered into the decision. It would also involve an exploration of the veracity of Tsonis' comments to plaintiff as to why he was not receiving the promotion, which in turn, might well include a foray into the disciplinary proceedings brought against Tsonis with regard to his conversation with plaintiff.
The case was three-and-one-half years old, and the judge was not amenable to an adjournment. He suggested that plaintiff file a separate suit, which was not time-barred, if he chose to pursue the nonpromotion to sergeant claim. Plaintiff did so. That suit is pending. Counsel advised us at oral argument that the case is trial-ready, but trial has been deferred until the conclusion of this appeal.
We recognize that amendments to pleadings "shall be freely given in the interest of justice." R. 4:9-1. Nevertheless, such determinations are left to the sound discretion of the trial court, which will not be disturbed on appeal in the absence of clear abuse of discretion. Franklin Med. Assocs. v. Newark Pub. Sch., 362 N.J.Super. 494, 506, 828 A.2d 966 (App.Div.2003). We find no abuse of discretion here.
Likewise, we find no abuse of discretion in the judge's order barring the evidence from the trial of plaintiff's remaining claims. The conversation between plaintiff and Tsonis occurred two years after the precipitating event underlying the hostile work environment claim. It did not involve the circumstances revolving around the hostile work environment claim. As we have pointed out, presenting this evidence would have opened the door to considerable collateral matters. To the extent that it may have been at all relevant, we find no abuse of discretion in the judge's determination that its probative value would have been substantially outweighed by the risk of undue prejudice, confusion of issues, or misleading the jury. See N.J.R.E. 403(a).
At the commencement of trial, Dorn also moved to exclude evidence relating to a sign referred to in plaintiff's complaint. On July 1, 1999, at a swearing-in ceremony of a number of officers, including Tsonis being sworn in as Chief and plaintiff being sworn in as corporal, an unidentified member of the public held up a sign that read (with the first three lines crossed out, as shown):
 HALE TO THE CHEF
 HIEL TO THE CHIEF
 HEIL TO THE CHEFF
 RICK FOR MAYOR
Plaintiff argued that the sign was admissible in evidence because plaintiff contended he saw Tsonis shake the hand of the sign holder, thus constituting an act of ratification by upper management of the sign's contents, which, according to plaintiff, had an anti-Semitic connotation. The judge rejected plaintiff's argument, finding that in view of the misspellings and crossing-outs, the sign did not appear to be anti-Semitic but "somebody making a joke out of spelling." The judge also felt that the ratification argument was "somewhat of a stretch." We agree. In our view, the sign was not relevant and, at best, any minimal probative value would have been substantially outweighed by the risk of undue prejudice, confusion of issues or misleading the jury. See N.J.R.E. 403(a).
Affirmed on the appeal; reversed on the cross-appeal.
NOTES
[1] The complaint alleged one other incident, involving a sign held by an unidentified person in attendance at a swearing-in ceremony on July 1, 1999 that allegedly contained content that could be interpreted as anti-Semitic. Evidence of this incident was barred at trial, a ruling we will discuss in Part IV of this opinion.
[2] The humor file also contained materials of a sexual nature, which were barred from evidence.
[3] An Air Force regulation prohibiting the wearing of the wearing of headgear indoors had been applied to an orthodox Jewish officer who had worn a yarmulke. 475 U.S. at 504, 106 S.Ct. at 1311, 89 L.Ed.2d at 482. This decision was abrogated by statute. 10 U.S.C.A. § 774(a)-(b).