955 A.2d 917

JASON CUTLER, PLAINTIFF–APPELLANT, v. THEODORE DORN, ROBERT SHREVE AND BOROUGH OF HADDONFIELD, DEFENDANTS–RESPONDENTS, AND JOHN DOES 1 THROUGH 25, INCLUSIVE, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS.

Argued April 7, 2008—Decided July 31, 2008.

*Clifford L. Van Syoc* argued the cause for appellant (*Van Syoc Chartered,* attorneys; *Mr. Van Syoc, James E. Burden and Sebastian B. Ionno,* on the brief).

*Mario A. Iavicoli* argued the cause for respondent Borough of Haddonfield.

*William M. Tambussi* argued the cause for respondent Theodore Dorn (*Brown & Connery*, attorneys; *Mr. Tambussi, Susan M. Kanapinski, Louis R. Lessig and Michael J. Miles*, on the brief).

*F. Herbert Owens, III*, argued the cause for respondent Robert Shreve (*Sweeney & Sheehan*, attorneys).

*Philip Rosenbach* submitted a letter brief on behalf of amici curiae Anti–Defamation League, American Jewish Committee and Jewish Community Relations Council of Southern New Jersey (*Berman Rosenbach*, attorneys).

*Ravinder S. Bhalla* submitted a brief on behalf of amicus curiae The Sikh Coalition.

*Jon W. Green* submitted a brief on behalf of amicus curiae National Employment Lawyers Association/New Jersey (*Green, Savits & Lenzo*, attorneys; *Mr. Green, Alan Schorr, Ty Hyderally, Claudia A. Reis and Jennifer L. Vorih*, on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

This appeal involves a claim brought under the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, by a Jewish police officer who alleged that he was subjected to a hostile work environment based on his religion and ancestry. The principle issue before us is whether the trial court erred in denying a motion for involuntary dismissal and allowing the claim to be decided by the jury. The jury found in plaintiff's favor on the hostile workplace claim, however, it awarded plaintiff no damages. On appeal, the Appellate Division reversed that verdict, finding error in the trial court's denial of the dismissal motion and the later denial of a motion for judgment notwithstanding the verdict (nov). *Cutler v. Dorn*, 390 *N.J.Super.* 238, 255, 915 *A*.2d 65 (2007).

We granted plaintiff's petition for certification, 192 *N.J.* 595, 934 *A*.2d 637 (2007), and, for the first time, we will assess the sufficiency of a plaintiff's proofs in an essentially religion-based

hostile work environment claim. Consistent with this state's strong policy against any form of discrimination in the workplace, we hold that the threshold for demonstrating a religion-based, discriminatory hostile work environment cannot be any higher or more stringent than the threshold that applies to sexually or racially hostile workplace environment claims. Therefore, and also,consistent with our holdings on hostile workplace claims in those settings, we conclude that plaintiff's case satisfied the standards for a hostile work environment claim to warrant, and subsequently uphold, a jury determination. Accordingly, we reverse that portion of the Appellate Division's judgment.

## I.

### A.

Because the procedural posture of this case affects how we view the facts, we briefly review the background to this appeal. Plaintiff Jason Cutler had been employed by the Haddonfield Police Department since January 30, 1995, when, on July 14, 1999, he filed this LAD action against defendants, the Borough of Haddonfield (Haddonfield), Theodore Dorn, the former Director of Public Safety, and Robert Shreve, Jr., a fellow police officer. Cutler alleged a hostile work environment based on numerous incidents involving his coworkers and supervisors that were claimed to constitute harassment on the basis of his Jewish religion and ancestry. Although not included in the Complaint, Cutler also was permitted to present evidence that his promotion to corporal was delayed in retaliation for having commenced this action.

After a trial, the jury found that Cutler was subjected to a hostile work environment and that Haddonfield was liable.[1] The

---

[1] Before trial, the court dismissed Cutler's claim against Shreve because he was a coworker, rather than a supervisor. *See Cutler, supra,* 390 *N.J.Super.* at 249, 915 *A.2d* 65. During trial, the court also granted Dorn's motion for involuntary dismissal because there was insufficient evidence that he aided and abetted in discriminatory conduct. *See ibid.*

jury awarded no damages, however, and, further, found that the delay in Cutler's promotion was not retaliatory. Haddonfield moved for judgment nov, pursuant to *Rule* 4:40–2, and Cutler moved for post-judgment relief. Each was denied by the trial court.

Both parties appealed. The Appellate Division upheld the trial court's holdings in respect of those claims of error raised by Cutler that the panel reached. *Cutler, supra,* 390 *N.J.Super.* at 256–59, 915 *A.*2d 65. However, the panel's critical holding was to reverse the denial of Haddonfield's motion for judgment nov because the panel found that the alleged discriminatory conduct was "sporadic and not sufficiently severe or pervasive to create a hostile work environment under the LAD." *Id.* at 255, 915 *A.*2d 65.[2] We turn then to examine the conduct complained-of by Cutler.

## B.

■ Cutler had been employed as a police officer by Haddonfield since his graduation from the Police Academy in 1995.[3] During the period of time before he was promoted to corporal, Cutler, who is Jewish and whose faith and background were known by those with whom he worked, observed that his supervisors would make negative and demeaning comments, or alleged "jokes," about "Jews" while in his presence. As an example, Cutler pointed to the conduct of the then-Chief of Police, Bill Ostrander, who commented on Cutler's Jewish ancestry "a couple times a month." Ostrander often referred to Cutler as "the Jew" when Cutler was present. On one occasion that was memorable to

---

[2] For the same reason, the panel concluded that the trial court erred in denying the motion to dismiss. *Ibid.*

[3] In reviewing the trial court's determination on a motion for judgment notwithstanding the verdict, *R.* 4:40–2, we must accept as true all the evidence supporting plaintiff, and accord him all reasonable inferences arising from that evidence. *See Lewis v. Am. Cyanamid Co.,* 155 *N.J.* 544, 568, 715 *A.*2d 967 (1998). This recitation of facts reflects that constraint.

Cutler, Ostrander asked Cutler "where [his] big Jew ... nose was," apparently referencing the fact that Cutler's nose was smallish. According to Cutler, Lieutenant Lawrence Corson also made comments about persons of Jewish faith. Corson would work into his conversations with Cutler such comments as "Jews are good with numbers," "why didn't you go into your family business ... why are you here," and "Jews make all the money."

Cutler testified that he considered complaining about Ostrander's and Corson's comments, but, fearing retaliation, he decided against it.. He explained that, because Haddonfield has a small police department with limited prospects for promotion, he feared that complaining about his superior officers would cripple his opportunities for advancement. Regardless, the frequent comments about "Jews" and about stereotyped characteristics of persons of Jewish faith and ancestry caught Cutler off-guard. As he put it, he understood that there would be times when members of the public might make inappropriate comments, but he never expected such conduct from police officers.

> [Y]ou expect that coming from the people that you deal with on a day-to-day basis through your job not through your—you know, as a police officer you're busy, more worried about the people that you come in contact with [publicly] than not—you don't expect to be subjected to that from your own place of employment.

Cutler further testified that, although he believed that Ostrander's and Corson's belittling, anti-Semitic comments may have been intended as an ill-attempt at "humor," Cutler nonetheless considered the comments offensive. Because "the top two brass [were] making anti-Semitic comments," Cutler believed that there was a culture within the department that was "ripe with anti-Semitism."

Cutler's claim of a religion-based hostile workplace arose from more than the fact that superior officers, Ostrander and Corson, sought out opportunities to introduce into general conversation, in his presence, anti-Semitic or otherwise denigrating comments about persons of the Jewish faith. The effect of those humiliating, derogatory comments about Cutler's religion was amplified by several incidents that caused Cutler to feel that he was subjected to discriminatory or harassing treatment because of his religion.

In one instance, a superior officer told Cutler not to wear his yarmulke during Passover because it would be noncompliant with Haddonfield's uniform requirements; yet, Cutler observed that another member of the police department was allowed to wear a "Jesus First" pin on his uniform's lapel. Although Cutler believed that he was being subjected to unfair and discriminatory treatment, he did not complain because he was reluctant to "make waves" in the department.

In another incident, Cutler arrived at work to find that a sticker of an Israeli flag had been placed on his locker. At first, "[he] didn't really think anything of it." However, a few weeks thereafter, a sticker of a German flag was placed above the Israeli flag sticker. Cutler was offended by the action because he believed that the stickers were placed in reference to the Holocaust and that "somebody was trying to send [him] a message." Again, Cutler did not file a complaint because he "didn't want to give the person who put it on there the satisfaction of letting them know that it got to me."

According to Cutler, the "straw that broke the camel's back" and that led to the commencement of this action stemmed from an incident that occurred on April 18, 1999. Cutler, fellow patrolman Robert Shreve, Jr., and then-corporal Mark A. Knoedler were on duty at the stationhouse preparing to watch a training video about diplomatic immunity. Shreve asked Knoedler and Cutler if they knew why they were being required to watch the video. Knoedler responded, informing Shreve that the Maccabi games were to be held in Cherry Hill. Cutler explained to Shreve that the Maccabi games were "the Jewish [O]lympics" [4] and constituted an important event in the Jewish community. At that moment, Shreve blurted out "Those dirty Jews." When Cutler asked Shreve to

---

4 Indeed, as reported in the newspaper, the competitions in these "Olympic-style games for Jewish teenagers" took place in August. Martin Z. Braun, *Friendship, Sports, Security, Maccabi Games Open Under Watchful Eyes,* Phila. Inquirer, Aug. 17, 1999, at B1.

repeat what he had said, Shreve altered his statement to "those sturdy Jews."

Cutler testified that he was "amazed," "upset," and "stunned" by Shreve's comment.

> That's not a flattering comment. I mean, that's—you know, I looked on it as basically somebody, you know, using the N word. I mean it was—it's disgusting. . . .

After the video ended and Shreve left the room, Cutler told Knoedler that Shreve's comment had offended and upset him. Knoedler then went to Shreve and told him that his remark was inappropriate and that he should apologize to Cutler. Shortly thereafter, Shreve met with Cutler and explained that the comment was meant as a joke and that he was sorry. Cutler replied that he considered the comment insensitive and that he did not consider it to be "harmless humor."

A few days later, Knoedler asked Cutler if he wanted to file a Bias Incident Complaint concerning Shreve's comment. Cutler was hesitant to file a complaint, believing that doing so could jeopardize his career within the department because Shreve had a close relationship with the Director of Public Safety, Theodore Dorn. Nonetheless, he submitted a letter complaint reporting Shreve's comment. In that letter, Cutler also complained that other individuals in the department had engaged in hostile conduct directed at him because of his Jewish ancestry.

When asked at trial why he waited a few days after the incident to file a complaint, Cutler testified to his mixed feelings about complaining:

> I thought I had a thicker skin. You know, I didn't think, you know, comments like that would bother me or I was almost disappointed in myself for being so upset.
>
> . . . .
>
> I hoped in myself ... that I,—you know, I wouldn't—have a thick skin, being a police officer. I would try not to let comments bother me, but in this case it didn't happen.
>
> . . . .
>
> It's kind of like this was the straw that broke the camel's back. . . . So it was just a culmination of events that just, you know, built up and built up, and finally I opened my mouth.

In response to the complaint, Haddonfield's Internal Affairs Department conducted an investigation, which resulted in a recommendation that Shreve be issued a "letter of counseling" explaining the inappropriateness of his action and advising him that such behavior would not be tolerated in the future. Sensitivity training also was recommended.

Less than three months after the incident with Shreve, Cutler attended an unrelated disciplinary hearing involving another officer in the department. Shreve was a witness in that hearing. In the course of his testimony, Shreve was asked about the incident with Cutler. Shreve described his comment during the April 18, 1999, encounter as "let's get rid of all those dirty Jews." Immediately upon hearing Shreve's testimony, Cutler became very upset.[5] He interpreted Shreve's account of his earlier comment as reflecting an advocacy of genocide and again was reminded of the Holocaust. Cutler testified that he considered Shreve's comment to be threatening and that, thereafter, he began to experience frequent insomnia, headaches, and anxiety. His distress was made worse by Haddonfield's failure to adequately address the matter. According to Cutler, Shreve was not disciplined sufficiently for his comment, which was, to Cutler, like "a slap in the face."

On July 14, 1999, only days after hearing Shreve's testimony in that unrelated departmental hearing, Cutler filed the Complaint in the instant action.

## II.

As this Court has long recognized, New Jersey has a strong interest in maintaining "discrimination-free workplace[s]" for workers. *Lehmann v. Toys 'R' Us, Inc.,* 132 *N.J.* 587, 600, 626 *A.*2d 445 (1993). The Legislature enacted the remedial Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49, to provide

---

[5] When asked to quantify for the jury the level of distress he experienced, Cutler testified, "It would be off the scale."

an effective means "to root out the cancer of discrimination." *Cicchetti v. Morris County Sheriff's Office*, 194 *N.J.* 563, 588, 947 *A.*2d 626 (2008) (citing *Fuchilla v. Layman*, 109 *N.J.* 319, 334–35, 537 *A.*2d 652 (1988)). The LAD protects "aggrieved employees," *Lehmann, supra*, 132 *N.J.* at 600, 626 *A.*2d 445, by specifically making it unlawful

> [f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, sex ... of any individual, ... to refuse to hire or employ or to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.
>
> [*N.J.S.A.* 10:5–12(a).]

Among the prohibited forms of employment discrimination is harassment, based on race, religion, sex, or other protected status, that creates a hostile work environment. *See Lehmann, supra*, 132 *N.J.* at 601, 626 *A.*2d 445.

■ In *Lehmann, supra*, this Court established the basic requirements for determining whether workplace acts of sexual harassment constitute prohibited discrimination under the LAD. 132 *N.J.* at 603–04, 626 *A.*2d 445. This Court required that a plaintiff, claiming a hostile workplace based on acts of sexual harassment, must prove that

> the complained-of conduct (1) would not have occurred *but for* the employee's gender; and it was (2) *severe or pervasive* enough to make a(3) *reasonable woman* believe that (4) the conditions of employment are altered and the *working environment is hostile or abusive.*
>
> [*Ibid.*]

■ Although *Lehmann* involved sexual harassment in the workplace, *Lehmann*'s test applies generally to hostile work environment claims. *See Taylor v. Metzger*, 152 *N.J.* 490, 497, 706 *A.*2d 685 (1998). Thus, where, as here, a hostile work environment claim involves allegations of harassment based on religious faith or ancestry, the inquiry is whether a reasonable person of plaintiff's religion or ancestry would consider the workplace acts and comments made to, or in the presence of, plaintiff to be sufficiently severe or pervasive to alter the conditions of employment and create a hostile working environment. *See El–Sioufi v.*

*St. Peter's Univ. Hosp.*, 382 *N.J.Super.* 145, 178, 887 *A.*2d 1170 (App.Div.2005) (stating same for religion-based hostile workplace claim).

 When evaluating whether conduct is sufficiently severe or pervasive to create a hostile work environment, we focus on the *"harassing conduct* . . . , not its effect on the plaintiff or the work environment." *Lehmann, supra*, 132 *N.J.* at 606, 626 *A.*2d 445. That is because neither "a plaintiff's subjective response" to the harassment, *id.* at 613, 626 *A.*2d 445, nor a defendant's subjective intent when perpetrating the harassment, *id.* at 604–05, 626 *A.*2d 445, is controlling of whether an actionable hostile environment claim exists. Whether harassing conduct makes a work environment hostile is assessed by use of a reasonable person standard.[6] *See Lehmann, supra*, 132 *N.J.* at 603–04, 626 *A.*2d 445. We adopted that objective standard to provide flexibility so that the definition of "harassment" would reflect evolving community standards. *Id.* at 612, 626 *A.*2d 445.

 Thus, "severe or pervasive" conduct must be conduct that would "make a reasonable [person] believe that the conditions of employment are altered and [that the] working environment is hostile." *Id.* at 604, 626 *A.*2d 445. Making that assessment requires an examination of the totality of the circumstances. *See id.* at 607, 626 *A.*2d 445 ("Rather than considering each incident in isolation, courts must consider the cumulative effect of the various incidents, bearing in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." (internal citations and quotation marks omitted)). Most recently, our opinion in *Green v. Jersey*

6 In *Lehmann, supra*, we held that, in the sexual harassment context, the reasonable person standard is gender-specific. 132 *N.J.* at 611–12, 626 *A.*2d 445. Thus, we directed courts to consider sexual harassment claims brought by a woman "from the perspective of a reasonable woman." *Ibid.* Likewise, "[i]f the plaintiff is male, the perspective used shall be that of a reasonable man." *Ibid.*

*City Board of Education* elaborated on that aspect of a hostile work environment claim, explaining that such causes of actions are "different" from claims based on discrete acts of discrimination, and that hostile environment claims "are based on the cumulative effect of [the] individual acts." 177 *N.J.* 434, 447, 828 *A.*2d 883 (2003) (citing and quoting *Shepherd v. Hunterdon Developmental Ctr.*, 174 *N.J.* 1, 19–20, 803 *A.*2d 611 (2002) (internal quotation marks omitted)).

> In determining whether an actionable hostile work environment claim exists, we look to "all the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."
>
> [*Ibid.*]

"Severe or pervasive" conduct, therefore, can be established by citing "numerous incidents that, if considered individually, would be insufficiently severe." *Lehmann, supra,* 132 *N.J.* at 607, 626 *A.*2d 445. Viewing incidents solely in isolation fails to account for the cumulative and debilitating effect that harassing conduct can have in the workplace. In most cases, it is the cumulative impact of separate successive incidents that cements the hostile work environment.[7] *Ibid.*

### III.

The LAD's promise of a discrimination-free workplace extends to all persons who wish to be free of the hostile environment that can arise from severe or pervasive harassment having a nexus to one's faith. Antagonistic, degrading, or demeaning conduct in the workplace that is directed at or about one's religious faith, or ancestry, can be discriminatory and can amount to an unlawful hostile environment. The question here is whether the conduct to which Cutler was subjected by his supervisors and colleagues at the Haddonfield Police Department amounted to severe or perva-

---

[7] Nonetheless, in certain circumstances, even a single comment can be so severe as to pollute the work environment, rendering it irretrievably hostile. *See Taylor, supra,* 152 *N.J.* at 495, 499, 502, 706 *A.*2d 685.

sive harassment that a rational factfinder could conclude would create a hostile work environment for a person of Jewish faith and ancestry. Although the LAD prohibits severe or pervasive workplace harassment about any religion or belief system, our focus in this matter is on harassment bearing a connection to the Jewish faith and ancestry of our plaintiff. Therefore, the unique history and background of Cutler's Jewish faith and ancestry provide the contextual setting for our consideration of the totality of the evidence marshaled by Cutler in support of his hostile work environment claim.

### A.

Initially, we dispense with any concern that not all of the comments testified to by Cutler, as creating an environment that he perceived to be anti-Semitic and derogatory toward persons of his faith and ancestry, were directed *at* him. Circumstances can give rise to an actionable hostile work environment claim even where the plaintiff was not the "target" of the offensive or harassing conduct. Id. at 611, 626 *A.*2d 445; *see also Mancini v. Twp. of Teaneck,* 349 *N.J.Super.* 527, 562–63, 794 *A.*2d 185 (App. Div.2002).

We turn next, in our analysis, to a factor that here seems to be obvious. The complained-of behavior—the derogatory and insulting statements about "Jews," the "dirty Jews" comments, and the many demeaning comments that stereotyped persons of Jewish ancestry, which were said to, or pointedly in the presence of, Cutler—was conduct that occurred because of Cutler's particular ancestry and religion. Those statements were not accidents in parlance. They were aimed to have an effect on their listener, and their listener was known to the speakers as a person of Jewish faith and ancestry. The uttering of those repeated comments clearly constituted a form of harassment for the person whose ancestry and religion was being demeaned and insulted. Accordingly, we must consider whether the conduct complained-of by Cutler was objectively hostile. As did the trial court, we

conclude that it could easily be found so and that, therefore, a jury should decide Cutler's claim.

One would not have to be thin-skinned to perceive these comments as hostile to persons of Jewish faith generally and to Cutler, who was known to be of Jewish faith. The Chief of Police repeatedly called Cutler, to his face, "the Jew" and asked Cutler about his lack of a "big Jew nose." And, with Cutler present as a known and intended observer of other comments, he was made to hear derogatory or stereotypic references, by other superior officers and colleagues in the police department, about persons of Jewish ancestry.

Those remarks were not only degrading but conveyed ongoing hostility toward Jewish people. The use of the word "dirty," as in "those dirty Jews," and the repeated iteration of the remark as, "let's get rid of all those dirty Jews,"[8] coupled with the other stereotypic statements were demeaning and could be viewed, objectively, as humiliating to a person of Jewish ancestry and faith.

Haddonfield excuses this conduct by emphasizing the existence of a "humor file" that contained crass characterizations and other outlandish drawings or caricatures involving public persons or persons within the department.[9] The humor file supposedly dem-

---

[8] The comment was repeated in a different way. The paraphrase could have reasonably been perceived by a factfinder to have underscored the speaker's derogatory intent in the remark.

[9] Haddonfield introduced evidence to show that the conduct about which Cutler complained was of the same degree and type as the conduct in which most of the Haddonfield police officers, including Cutler, regularly engaged. Haddonfield emphasized Cutler's "participation" in the department's "Humor Files," which are two file folders containing collections of characterizations, dirty jokes, sexual images, cut-and-pasted pictures, and the like. Among those included in the Humor Files was a document depicting an individual in a Nazi uniform giving a Nazi salute alongside a barbeque oven on which appeared the faces of two officers. At trial, Cutler described the document as "in poor taste," but did not believe it was directed at him. When asked whether Cutler "believe[d] the Humor File and the comments were all part of a[sic] atmosphere

onstrated the level of "ribbing" and "breaking of chops" that went on among the members of the department. *Cutler, supra,* 390 *N.J.Super.* at 254, 915 *A.2d* 65. It was cited as establishing the context in which the "Jew" comments were to be taken, as if to say that this conduct was welcomed by Cutler. We reject Haddonfield's facile explanation. Even in a work setting in which derogatory humor was a norm, this "humor file" defense fails to be dispositive of Cutler's claim of hostile work environment.

The complained-of comments did not arise out of exchanges involving the file. They occurred during the normal give and take of the daily workplace and demonstrated the pervasiveness of an anti-Jewish sentiment that comfortably could be voiced in this police department. The Appellate Division called it "teasing," *Cutler, supra,* 390 *N.J.Super.* at 254, 915 *A.2d* 65, but that moniker undervalues the invidiousness of these stereotypic references and demeaning comments that were directed at Cutler, or said in his presence. In this instance, those isolated incidents could be viewed, in the aggregate, to create an objectively humiliating and painful environment. Viewing each comment in a vacuum simply does not provide a properly objective assessment of their cumulative effect.

On repeatedly hearing those remarks, including utterances by supervisors, a person of Jewish faith and ancestry could reasonably feel that his sense of belonging was shaken; that his ability to be evaluated on an even playing field with others when opportunities for advancement arose was lost. It is no stretch to imagine that, for the hearer/recipient of those ongoing insults to his ancestry and core beliefs, which were uttered by his coworkers and, worse, his supervisors, the workplace was altered for the worse. Indeed, the reference to "dirty Jews," and the further iteration of that comment to "let's get rid of all those dirty Jews,"

---

in the Department for you guys to relieve tension, make the place a more happier [sic], fun, humorous place," Cutler responded in the affirmative.

In addition, we note that the defense introduced evidence that Officer Knoedler also was subjected to comments and jokes concerning his Christian religion.

harkened Cutler back to thoughts of one of the lowest times in mankind's history, the Holocaust. The document from the so-called "humor file" that depicted a Nazi soldier saluting alongside a barbeque on which were faces of members of the Haddonfield police force reasonably could generate a similar perception by the jury. Several of the other stereotypic comments also have historical anti-Semitic significance, as we were informed by the submission of amicus curiae, Anti–Defamation League, American Jewish Committee and Jewish Community Relations Council for Southern New Jersey.[10] Cutler's offense and distress were responses one could expect from a reasonable person of Jewish faith and ancestry.

In sum, the comments demonstrated an anti-Semitic bigotry that has no place in a workplace of this state. The trial court correctly recognized that Cutler's case should be decided by the jury and further determined, correctly, that the jury's verdict had adequate support in this record. The jury heard Haddonfield's "humor file" defense and other evidence about the workplace culture allowed in this police department and factored it into its liability determination, and likely also into its damages award. For purposes of evaluating the issue before us, however, we conclude that the comments and actions here went beyond conduct that was welcomed by Cutler and were actionable. We hold, therefore, that the jury made a determination that was supportable on this record.

### B.

In our view, it is necessary that our courts recognize that the religion-based harassing conduct that took place for Cutler in this "workplace culture" is as offensive as other forms of discriminatory, harassing conduct outlawed in this state. If the "ribbing" had been sexual in nature and female police officers were made to "go-

---

[10] The supervisors' comments perpetuated some of the odious and vicious stereotypes of Jews circulated during medieval times and the Nazi era.

along-with" a so-called "humor file" that was filled with bawdy pictures of nude women, we doubt that a female officer's sexually hostile workplace claim would have been dismissed or a jury's verdict overturned. Time and again, such inappropriate workplace "cultures" have given rise to liability for a hostile workplace environment based on sexual harassment. For example, in *Woods–Pirozzi v. Nabisco Foods*, 290 *N.J.Super.* 252, 269–73, 675 *A.2d* 684 (App.Div.1996), the Appellate Division held that summary judgment erroneously was granted to the defendants where the plaintiff presented evidence that her employer frequently commented on her sex. *Id.* at 270–71, 675 *A.2d* 684. For over three and one-half years, the plaintiff's supervisor and coworkers made persistent derogatory comments that included, among other things, (1) calling the plaintiff a "loser" in reference to her divorcee status and insisting that she must be looking "for a husband or to get laid"; (2) stating that the plaintiff would not get promoted because she was "a woman and a pain in [the supervisor's] a—"; (3) asking the plaintiff about intimate hygienic devices and other personal questions about her body; and (4) asserting that the plaintiff would not have been hired but for her looks. *Id.* at 269–72, 675 *A.2d* 684. The panel concluded that, "[c]onsidering the cumulative effect of all the frequent comments and incidents, ... a rational juror could conclude the conduct was pervasive enough to make a reasonable woman ... believe that her work environment was hostile, abusive, intimidating, or offensive." *Id.* at 270–71, 675 *A.2d* 684. Other examples involving sexually hostile workplace claims abound.[11]

---

[11] *See, e.g., Grazioli v. Genuine Parts Co.*, 409 *F.Supp.*2d 569, 573, 577 n. 12 (D.N.J.2005) (holding that plaintiff presented sufficient evidence of pervasive conduct to maintain LAD claim where, despite demands to cease, supervisor "[o]n a daily basis" sat behind plaintiff and sang sexually offensive song of his own creation, repeatedly made sexual gestures and vulgar comments, "constantly degrad[ed] [female employees] by simulating [oral sex] behind the backs of women who knelt down to retrieve items from [his] filing cabinet," and routinely commented on female employees' breasts and genitalia) (internal quotation marks omitted); *Smith v. Exxon Mobil Corp.*, 374 *F.Supp.*2d 406, 419 (D.N.J. 2005) (denying defendant union's motion for summary judgment because plain-

Racial harassment in the workplace, based on the accumulation of offensive and derogatory comments or supposed "jokes" uttered in the presence of African–American employees, has been met with similar opprobrium. *See, e.g., Aman v. Cort Furniture Rental Corp.*, 85 *F.*3d 1074 (3d Cir.1996) (upholding order denying employer's summary judgment motion where plaintiffs presented evidence that (1) coworkers referred to them and other black employees as "another one," "one of them," and "poor people"; (2) company's regional vice president referred to black supervisor as "that one in there"; and (3) plaintiffs' supervisor encouraged environment that was hostile to blacks by stating that "the blacks are against the whites"); *Streater v. City of Camden Fire Dep't*, 567 *F.Supp.*2d 667, 674 (D.N.J.2008) (denying defendant employer's motion for summary judgment on hostile work environment claim where plaintiff presented evidence that supervisor "regularly made jokes with derogatory racial themes" and "threatening comments with offensive racial content"); *DeCapua v. Bell Atlantic–New Jersey, Inc.*, 313 *N.J.Super.* 110, 124–26, 712 *A.*2d 725 (Law Div.1998) (denying defendant summary judgment on hostile work environment claim where plaintiff presented evidence that, on several occasions, his supervisor referred to him as "white boy," and used racial epithets in his presence).

■ A claimant asserting harassment on the basis of religious beliefs and ancestry is not required to bear a heavier burden in order to place his hostile work environment claim before the jury. The trial court correctly perceived that Cutler had presented a sufficient case to survive a motion for dismissal. That judgment was consistent with other judicial determinations that have recognized that a prima facie case for a religion-based hostile work environment claim can arise from the corrosive effect that religious taunts, belittling derogatory comments, and insults about

---

tiff employee presented evidence that plaintiff's coworkers (1) defaced calendar to mock plaintiff's single-mother status; (2) wrote that plaintiff "Blows" in graffiti on elevator wall; (3) referred to plaintiff as "bitch" and "slut"; and (4) regularly left pornography in work and break areas).

one's religious beliefs and ancestry can have when made in the workplace. For example, in *EEOC v. Sunbelt Rentals, Inc.,* 521 *F.*3d 306 (4th Cir.2008), the plaintiff employee had appealed the grant of summary judgment to his defendant employer on a Title VII hostile work environment claim premised on religious harassment. *Id.* at 313. The plaintiff's evidence had demonstrated that, over a period of approximately sixteen months, he had to hear coworkers tell him that the "Muslim religion is bad," *id.* at 316, accuse him of being a member of the Taliban and of hating America, *ibid.,* harass him about his kufi, his beard, and leaving his desk to pray, *ibid.,* and tell him that the United States should kill all Muslims, *id.* at 317. A supervisor called him a "towel head." *Id.* at 316. Based on that evidence, the Fourth Circuit · Court of Appeals stated that the plaintiff "suffered from religious harassment of the most demeaning, degrading, and damaging sort." *Id.* at 315. The court determined that the plaintiff's evidence demonstrated harassment that met the "severe or pervasive" standard because it was "persistent, demeaning, unrelenting, and widespread." *Id.* at 316 (internal quotation marks omitted). Therefore, the court reversed the grant of summary judgment and remanded the case for trial because "[a] reasonable jury could determine that the religious harassment ... was unwelcome indeed." *Id.* at 314.[12]

The trial court in this matter concluded that a like finding might be made on this record. And, when the jury heard the evidence, it concluded that Cutler proved that he had been subjected to an unwelcome hostile work environment based on his religion and ancestry. In our view, the trial court committed no error by its

---

[12] *See also EEOC v. WC & M Enters.,* 496 *F.*3d 393, 396 (5th Cir.2007) (reversing grant of summary judgment to defendant-employer and remanding for trial on hostile work environment claim premised on religious and national-origin based harassment); *Abramson v. William Paterson Coll. of N.J.,* 260 *F.*3d 265, 279 (3d Cir.2001) (reversing grant of summary judgment to defendant-college on hostile work environment claim premised on religious discrimination under Title VII and LAD because harassment was pervasive and, in aggregate, could be found to create hostile environment).

refusal to disturb the jury's assessment. When defendant moved post-trial for judgment nov, it bears repeating that the standard of review for such motions is to view all the facts in the light most favorable to the plaintiff. *R.* 4:40–2. In our view, and in light of that standard of review, there was sufficient evidence here for the jury to conclude that Cutler suffered severe or pervasive harassment that was unwelcome.

To the extent that the Appellate Division based its contrary conclusion on the earlier appellate holding in *Heitzman v. Monmouth County,* 321 *N.J.Super.* 133, 728 *A.*2d 297 (1999), we find that the panel erred. On the one hand, here, unlike as in *Heitzman,* the comments involved many that were made by Cutler's supervisors. Further, most of the objectively humiliating and degrading comments about Cutler's faith and ancestry, and the related conduct, were more directly aimed at Cutler than were the offensive remarks reviewed in *Heitzman.* More importantly, however, we never had the opportunity to review the determination reached in *Heitzman.* If the holding in *Heitzman* is perceived, in application, to suggest a different, and higher, threshold for demonstrating a hostile work environment when religion-based harassment is claimed, then that misapprehension must end.

This appeal has now given us our first opportunity to review the sufficiency of a plaintiff's case when religious harassment in a hostile workplace claim is alleged. Thus, the standard is now clear. Finding enough in this record to support the jury's conclusions, we hold that the trial court's post-trial decision, denying the defendant's motion for judgment nov, should not have been overturned. To the extent that the appellate judgment under review rejected the trial verdict, we now reverse.

## IV.

Cutler's petition for certification also included, among his claims of error, whether the courts below abused their discretion by not allowing him to amend his complaint to specify an additional act of retaliation on which discovery had been taken. Because the

petition for certification was granted in full, this issue is before us. However, because we are satisfied that the Appellate Division fully reviewed and correctly rejected this abuse of discretion claim, we affirm that portion of the Appellate Division's judgment substantially for the reasons stated in the opinion of the panel below. *Cutler, supra,* 390 *N.J.Super.* at 256–59, 915 *A.*2d 65.

## V.

In conclusion, we affirm the portion of the Appellate Division's judgment that affirmed the denial of plaintiff's motion to amend his complaint. We reverse the portion of the Appellate Division's judgment that reversed the trial verdict based on the trial court's denial of the motion for judgment nov, and that entered judgment for Haddonfield on plaintiff's hostile work environment claim. This matter is remanded to the Appellate Division so that it may decide any unresolved issues that plaintiff had raised on appeal, but which had been unnecessary to the Appellate Division's prior judgment.

*For affirmance in part/reversal in part/remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN and HOENS—5.

*Opposed*—None.