**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1863-23

BENJAMIN NDUAGUBU,

    Plaintiff-Appellant,

v.

ATLANTIC HEALTH SYSTEM,
MORRISTOWN MEDICAL CENTER,
CLIFF MOORE, DEBBIE TORRES,
MARSHA PARRISH, and STEVEN
SWEIGART,

    Defendants-Respondents.

_____

> Argued April 10, 2025 – Decided April 21, 2025
>
> Before Judges Mawla, Walcott-Henderson, and Vinci.
>
> On appeal from the Superior Court of New Jersey, Law Division, Essex County, Docket No. L-2916-17.
>
> Diego F. Navas argued the cause for appellant.
>
> Brett M. Anders argued the cause for respondents Atlantic Health System, Marsha Parrish, and Steven Sweigart (Jackson Lewis, PC, attorneys; Brett M. Anders and Patrick D. Laconi, on the brief).

PER CURIAM

Plaintiff Benjamin Nduagubu appeals from a January 31, 2024 order, which granted defendants Atlantic Health System (AHS), Cliff Moore, Debbie Torres, Marsha Parrish, and Steven Sweigart, involuntary dismissal of his perceived religious discrimination and hostile work environment claims, pursuant to Rule 4:37-2(b). We affirm.

Plaintiff was employed by AHS as a pharmacy technician at Morristown Medical Center. When he began his employment, he was provided with a copy of the AHS Code of Conduct, which requires AHS personnel to report actual or suspected violations of law or company policy. Pursuant to the AHS Employee Handbook, employees are expected to cooperate with internal investigations and are subject to discipline for failure to comply.

AHS's Internet Acceptable Use policy prohibits employees from visiting offensive internet websites; requires employees to notify their manager if they connect to an offensive website; and directs employees to exit such sites immediately. It further advises employees their internet use is subject to logging and analysis. Under a section entitled "Offensive Web Sites," the Internet Acceptable Use Policy states employees "using [AHS] computers who discover they have connected with a web[]site that contains sexually explicit, racist,

sexist, violent, or other potentially offensive material must immediately disconnect from that site[] and notify their manager."

On June 13, 2016, while beginning her morning shift at approximately 7:00 a.m., a lead pharmacist noticed plaintiff, who had worked the overnight shift the night before, was still logged into their shared work computer. She noticed plaintiff had left open a website relating to the "burning of the Quran." The pharmacist was concerned this was a violation of AHS's policies and did not want to be blamed for accessing the content. She had no knowledge of plaintiff's religious affiliation and did not presume him to be a Muslim based on the contents of the webpage she observed.

Following AHS policy, the pharmacist reported the incident to Moore, who was her manager, and AHS security. Moore met with the pharmacist regarding her concerns. Although Moore never saw the webpage the pharmacist viewed, he understood its contents were inappropriate because it depicted the destruction of a religious text.

Parrish was AHS's corporate investigator. Previously, she had been a special agent for the Federal Bureau of Investigation (FBI) for approximately twenty-two years, where she was trained and experienced in anti-terrorism, and in conducting interviews and investigations. She conducted over seventy

3

investigations per year at AHS, approximately thirty of which involved improper internet use. Parrish opened an investigation the same day the pharmacist reported her concerns.

Parrish first interviewed Moore to obtain general information about plaintiff and his employment with AHS. Moore informed Parrish about a verbal warning plaintiff previously received for using his personal laptop too often in the workplace instead of helping his fellow employees.

Parrish then interviewed the pharmacist, who explained the article she saw, and that plaintiff was the last person logged into the computer. After the early stages of her investigation, Parrish issued a request to AHS's Information Systems and Services Department (ISS) for an analysis of all websites accessed by plaintiff and the time he spent on the internet during work hours. An ISS engineer provided Parrish with a printout of plaintiff's recent activity on AHS's computer systems and printouts from some of the websites plaintiff was believed to have visited, including those from June 13.

The engineer informed Parrish plaintiff appeared to have "accessed [twenty ']Islamic['] websites in one day, including an article which pictured a male, appearing to be [Muslim,] holding the severed head of a woman." This raised red flags for Parrish based on her FBI training and experience, so she

requested the engineer conduct a more extensive analysis of plaintiff's computer and internet usage at work. Using a special software program, the engineer searched at the network level and provided Parrish with an analysis showing plaintiff had spent 18.7 hours on the internet between June 1 and 22, 2016.

Parrish spoke to her supervisor, and the decision was made to share this information with the Morristown Police Department to see if further investigation was required. Morristown Police contacted the Morris County Prosecutor's Office. Parrish later learned Morristown Police and the New Jersey Department of Homeland Security (DHS) completed an investigation and concluded plaintiff was not a threat. Parrish and AHS were notified and continued their internal investigation to ascertain whether plaintiff violated any AHS internet policies.

On August 12, 2016, plaintiff was asked to come into work early on August 17, 2016, to meet with Parrish. He was advised to report to AHS at 6:00 p.m., two hours prior to the start of his scheduled shift, go directly to the Security Department, and ask for Parrish at the window. Plaintiff complied and was escorted to a conference room, where he met with Parrish and Sweigart, another member of the AHS Security Department. Sweigart was present as a witness

A-1863-23

because AHS had a practice of having a person of the same gender as the interviewee present if the investigator was of the opposite sex.

During the interview, Parrish asked plaintiff questions relating to his internet usage, including the website left open on the shared computer, and similar websites discovered by the ISS engineer. She showed plaintiff a list of the other websites he was believed to have visited, including pictures and screenshots of those websites.

One of the photos was part of an article from a website Parrish believed plaintiff visited, which depicted a soldier holding what appeared to be a severed human head. After being shown the list of websites and the photo, plaintiff volunteered that he was Catholic. Plaintiff said he sometimes conducted internet research for his graduate studies on various topics relating to violence, including why people harm or kill others in the name of religion. He "would visit basically any website that can get information regarding the prevention of youth violence," those about "preventing any threat to . . . society and the community," and "issues that may become a threat to . . . society."

During the interview, plaintiff was directed to write a statement about what he told Parrish. The statement said that during the interview, plaintiff was asked about: the amount of time he spent on the internet; the websites he was

6

visiting; the searches he was performing on the internet; when he was accessing these websites; the pictures he may have viewed; prior co-worker complaints about his laptop usage; his graduate studies; whether he had been warned before about his internet usage; his religious affiliation; his nationality; his activities at other AHS facilities; and how he would view a Muslim co-worker. Plaintiff also wrote that "in the wake of some people killing others in the name of religion, [he] may have done some searches to know why." The statement noted it was "made by [him] freely and willingly, without any coercion or promises."

After finishing his written statement, plaintiff went to the bathroom and returned to the interview room. Parrish continued to ask him about his internet use and why he was violating AHS's policies. At the end of the interview, plaintiff was instructed not to use the internet at work.

Parrish provided her findings to Moore and prepared a corporate investigation report. Moore discussed the report's findings with Torres, who was plaintiff's supervisor. It was decided plaintiff would receive a written warning.

On or around October 20, 2016, plaintiff received a written warning from AHS's Pharmacy Interim Manager. It explained plaintiff spent an excessive amount of time on the internet and had accessed inappropriate content. On

October 31, 2016, plaintiff emailed Moore, AHS's Chief Executive Officer, and all AHS pharmacists and pharmacy technicians, detailing what he believed were discriminatory practices in the pharmacy under Moore's leadership. He complained about alleged racial and gender discrimination in promotions, and retaliation for complaints about workload and scheduling.

Plaintiff's email complaints mirrored a document he drafted earlier on August 1, 2016, entitled "Statement of Job Discrimination/Civil [R]ights [V]iolation." He alleged his civil rights were violated because of: a scheduling change in June 2014; the denials of promotion he believed constituted gender discrimination and retaliation; and instances of "[n]ationality discrimination" in November and December 2014, December 2015, and March 2016.

Related to the investigation and interview in this matter, the document stated:

> In March [2016], now as a Master of Public Health student [at a u]niversity, I started using libraries at my job (Morristown and Overlook Medical Centers) for research[]. I notified my [m]anager and his team about my Masters program.
>
> [On] May 2, 2016[,] the pharmacy management informed me that someone reported that I use my laptop during my break time in the department (overnight staff take their break in the department). They counseled me to stop bringing my laptop to the department and that we have enough computer[s] in the department. [The]

A-1863-23

Security Dep[artment] was notified to scrutinize my internet [usage].

[In] June[] 2016[,] the management/security dep[artment] started to track my computer/internet use.

On August 17, 2016[,] . . . management sent me (without a witness) to meet with security . . . . The meeting caused me health problems.

Plaintiff alleged Parrish "started taunting, harassing, and intimidating [him] with false allegations," including: accusing him of spending over eighteen hours on the internet; showing him disturbing pictures of beheadings; and asking questions about his family, social circles, criminal history, length of employment, license to work, his views of other persons' religions, his religion, place of worship, and immigration status. Neither plaintiff's August 2016 document nor his October 31, 2016 email referenced religious discrimination.

On October 4, 2016, before receiving the written warning, plaintiff completed an EEOC intake questionnaire. He alleged sex, national origin, and religious discrimination, as well as retaliation. Relevant to this appeal, he alleged "[h]arrassment due to religion by security officer[s] instigated by" Moore.

Plaintiff alleged another search of his work computer occurred in November 2016. On December 12, 2016, plaintiff claimed he was visited at his

9

home by three plain clothes officers who were "banging on [his] door." One of the officers identified himself as a Morristown Police officer and another as a DHS officer; the third did not reveal his affiliation. The Morristown officer told plaintiff he was there following a report from AHS, and the officers spoke with plaintiff for approximately twenty to thirty minutes.

On April 21, 2017, plaintiff filed a twelve-count complaint against defendants, alleging violations of the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -49, for: retaliation; discriminatory failure to promote; race and national origin discrimination; religious discrimination; gender discrimination; age discrimination; hostile work environment; and supervisory liability against Moore and Torres. The complaint also alleged counts for: violation of company policy; state tort law liability against Parrish and Sweigart; intentional and negligent infliction of emotional distress; and punitive damages.

Following discovery, defendants won summary judgment on all the counts except the religious discrimination, hostile work environment, the state tort law, intentional infliction of emotional distress, and punitive damages claims. The remaining counts were subject to a bench trial over the course of three days during September 2023, and dismissed after plaintiff rested his case. Plaintiff,

Moore, the lead pharmacist who initially reported the matter, Sweigart, and Parrish testified and relayed the salient facts as we have described them.

The trial judge granted dismissal of the perceived religious discrimination claim because there was no evidence plaintiff suffered an adverse job action. The judge found the interview with Parrish was not actionable conduct and plaintiff "continued working for many, many years after the incident. [He w]as not . . . demoted, [nor] did . . . [he] lose any pay."

The hostile work environment claim failed because plaintiff had "to allege that the complained of conduct would not have occurred but for a protected characteristic and that it was severe or pervasive enough to make a reasonable person believe that the condition[s] of employment were altered and the work environment was hostile or abusive." Plaintiff failed to meet either prerequisite.

The judge found the catalyst for the investigation was not plaintiff's religion, but the lead pharmacist's discovery of the webpage plaintiff visited. There was no testimony showing the pharmacist had any knowledge of plaintiff's religion. Neither the pharmacist nor Moore "indicated that they knew or had any concern about [plaintiff's] religion. . . . [T]here's nothing in this case that [suggests] someone perceived him to be Muslim and that's what precipitated this investigation." Parrish also testified she did not perceive plaintiff was Muslim.

11

There was no evidence presented of a hostile work environment as well. Plaintiff "was treated the same both before and after . . . in fact he had excellent . . . reviews after. . . . [T]here was testimony that he never used the internet for personal use again . . . ." Plaintiff remained employed by AHS for several years until just prior to the trial.

I.

Plaintiff contests the dismissal of his hostile work environment claim because the record shows defendants' conduct was motivated by his perceived religious affiliation and the conduct met the severe and pervasive standard required by the LAD. He claims that from the moment the article mentioning the burning of the Quran was discovered and it was determined plaintiff had last used the workstation, the lead pharmacist and Moore "equated . . . plaintiff's viewing of an article about . . . Islam to terrorism." This was evidenced by the fact the investigation that followed was conducted by a veteran of anti-terrorism investigations, who considered the article to be a red flag.

Plaintiff argues the investigation itself signaled defendants' discriminatory perception. For example, Parrish requested ISS conduct a search using religion as a parameter, and when she received the results of two separate searches, which contained a list of Islamic websites and another with Christian

websites, she focused only on the former category. Parrish's investigative materials only contained information on Islam and were the only ones she informed law enforcement about. She also exaggerated plaintiff's internet use by claiming he had accessed more than twenty Islamic websites. The totality of this evidence showed defendants perceived plaintiff to be Muslim and equated his perceived faith with terrorism.

Plaintiff claims defendants' conduct was severe and pervasive because they referred the matter to law enforcement, who then visited and interrogated him at home. Although plaintiff was never criminally charged, he asserts he was nonetheless accused of being a terrorist and subjected to an investigation and interrogation, which included showing him disturbing images that caused him emotional distress. Plaintiff points to the fact that following his two-and one-half hour interrogation with AHS officials he went to the emergency room for an initial evaluation and eventually treated with a psychiatrist, who provided psychotherapy and medication. He continues to see his psychiatrist, and his psychiatric expert opined he suffered emotional trauma following the incident.

Plaintiff argues he suffered an adverse employment action, evidenced by defendants' continued investigation, even after law enforcement declined to pursue charges, leading to a disciplinary warning. The adverse employment

13

action was also evidenced by the fact defendants investigated him a second time when plaintiff filed an EEOC complaint and sent an email complaining about the discrimination.

Plaintiff points us to Nardello v. Township of Voorhees, 377 N.J. Super. 428, 434-35 (App. Div. 2005), and asserts there we held that a series of retaliatory acts could constitute adverse action. He also relies on Green v. Jersey City Board of Education, 177 N.J. 434, 448 (2003), which found an accumulation of minor instances of behavior could constitute an adverse employment action under the Conscientious Employee Protection Act, N.J.S.A. 34:19-1.

Like these cases, defendants' behavior qualified as adverse employment action because they: treated him in a discriminatory manner on the presumption he was Muslim; subjected him to a security department investigation based on false or misleading evidence; reported him to law enforcement; subjected him to a long, humiliating, and stressful interrogation; and issued a false written warning, which never established that he accessed the allegedly offensive material.

II.

14

We review a motion for judgment at the close of the evidence de novo, applying the same standard as the trial judge. Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016). "Neither the trial judge nor the appellate court is concerned with the weight, worth, nature or extent of evidence, but must accept as true all the evidence supporting the party opposing the motion, and accord [that party] the benefit of all favorable inferences." Polyard v. Terry, 160 N.J. Super. 497, 505-06 (App. Div. 1978).

The LAD prohibits unlawful employment practices and discrimination in the form of harassment "based on . . . religion, . . . or other protected status, that creates a hostile work environment." Cutler v. Dorn, 196 N.J. 419, 430 (2008) (citing Lehmann v. Toys 'R' Us, 132 N.J. 587, 601 (1993)); see also N.J.S.A. 10:5-12(a). This includes discrimination based on a plaintiff's perceived status. See Cowher v. Carson & Roberts, 425 N.J. Super. 285, 297 (App. Div. 2012) ("[I]f [a] plaintiff can demonstrate that the discrimination that [they] claim[] to have experienced would not have occurred but for the perception that [they are of a particular religion, the] claim is covered by the LAD.").

In analyzing claims under the LAD, New Jersey has adopted the "procedural burden-shifting methodology articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Zive v. Stanley Roberts, Inc., 182 N.J.

436, 447 (2005). To establish a claim of hostile work environment under the LAD, a plaintiff must show the complained-of conduct: "(1) would not have occurred but for the employee's [protected status]; and it was (2) severe or pervasive enough to make a (3) reasonable [person] believe that (4) the conditions of employment [were] altered and the working environment [was] hostile or abusive." Lehmann, 132 N.J. at 603-04 (emphasis omitted).

The "defining element" of a hostile work environment claim is whether the protected characteristic was the cause of the harassment. Herman v. Coastal Corp., 348 N.J. Super. 1, 20 (App. Div. 2002). To that end, "[c]ommon sense dictates that there is no LAD violation if the same conduct would have occurred regardless of the plaintiff's [protected status]." Lehmann, 132 N.J. at 604.

We apply "an objective standard to evaluate a hostile work environment claim." Rios v. Meda Pharm., Inc., 247 N.J. 1, 12 (2021) (citing Cutler, 196 N.J. at 431). "The standard focuses on the . . . conduct itself and 'not its effect on the plaintiff or on the work environment.'" Ibid. (quoting Lehmann, 132 N.J. at 606). Thus, "neither 'a plaintiff's subjective response' to the harassment, nor a defendant's subjective intent when perpetrating the harassment is controlling of whether an actionable hostile work environment claim exists." Cutler, 196 N.J. at 431 (quoting Lehmann, 132 N.J. at 604-05, 613).

Any hostile work environment claim "must be evaluated in light of 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Rios, 247 N.J. at 10-11 (quoting Cutler, 196 N.J. at 432). To determine whether conduct is sufficiently severe or pervasive, "courts must consider the cumulative effect of the various incidents, bearing in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." Id. at 11 (quoting Lehmann, 132 N.J. at 607).

The trial judge correctly dismissed the hostile work environment claim because plaintiff did not show defendants' conduct would not have occurred but for their alleged perception that he was Muslim. The objective evidence showed plaintiff clearly violated AHS policies in the manner he used the computer and internet at work, and the violation was the catalyst for the pharmacist's initial report and drove the investigation. There was no testimony that any defendant perceived plaintiff was Muslim or acted because of such a perception.

The evidence did not demonstrate the "defining element" of a hostile work environment claim, namely, that plaintiff's protected characteristic, his

perceived religion, was the cause of the harassment. A common sense view of the evidence shows defendants would have investigated in the same manner, regardless of plaintiff's religious affiliation. The subjective effects of the investigation on plaintiff and evidence of the psychiatric treatment he received did not establish a hostile work environment and were not a factor for consideration by the trial judge.

To establish a discrimination claim under the LAD, a plaintiff must show: "(1) [they were in] a protected class; (2) [they were] performing [their] job at a level that met [their] employer's legitimate expectations; (3) [they] suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions." El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 167 (2005) (citing Maher v. N.J. Transit Rail Operations, Inc., 125 N.J. 455, 480-81 (1991)). The LAD prohibits adverse employment actions in that "[n]o person shall take any retaliatory action, including but not limited to failure to hire, discharge, suspension, demotion, discrimination in the terms, conditions, or privileges of employment, or other adverse action, against a person" based on that person's protected status. N.J.S.A. 10:5-12.10.

The trial judge properly dismissed plaintiff's religious discrimination claim because there was no adverse employment action taken against him.

Plaintiff was issued a written warning on account of his failure to comply with AHS's internet-use policy. He remained employed for AHS for more than six years after the investigation and received only positive reviews until his resignation several years later. For these reasons, the religious discrimination claim was not viable.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division