**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1642-23

RENE EDGHILL SMITH,

    Plaintiff-Appellant,

v.

NEW BRUNSWICK BOARD
OF EDUCATION, AUBREY A.
JOHNSON, Superintendent of
New Brunswick Schools, and
KENNETH M. REDLER, Principal
of New Brunswick High School,

    Defendants-Respondents.

_____

Argued March 20, 2025 – Decided March 28, 2025

Before Judges Mawla, Natali, and Walcott-Henderson.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Docket No. L-1445-20.

Luretha M. Stribling argued the cause for appellant.

Jillian T. Stein argued the cause for respondents (Kluger Healey, LLC, attorneys; Jillian T. Stein, on the brief).

PER CURIAM

Plaintiff Rene Edghill Smith appeals from a January 5, 2024 order granting summary judgment in favor of defendants New Brunswick Board of Education (NBBOE), Aubrey A. Johnson, the Superintendent of New Brunswick Schools, and Kenneth E. Redler, Principal of New Brunswick High School; and dismissing her complaint with prejudice. We affirm.

Plaintiff was hired in 2016, as one of four vice principals at New Brunswick High School, and worked there for three school years as a nontenured employee. Her contracts each lasted one school year and were subject to renewal after each school year. Following the 2018-19 school year, plaintiff's contract was not renewed. Plaintiff is Black and was fifty-nine-years-old at the time of her non-renewal. She sued pursuant to the New Jersey Law Against Discrimination (LAD), N.J.S.A. 10:5-1 to -50, alleging: race and age discrimination; a hostile work environment and retaliation; and Johnson aided and abetted in the discrimination. Her complaint also sought punitive damages.

Following the close of discovery, defendants moved for summary judgment. The motion judge adjudicated defendants' motion and issued a written opinion detailing the parties' arguments, the salient facts, and applicable law. We take the following facts from the summary judgment record.

A-1642-23

At her deposition, plaintiff testified she first applied for a vice principal position at New Brunswick Middle School but received an interview for a position at the high school. Another vice principal and Redler interviewed plaintiff. Redler and Johnson then decided to hire plaintiff as a vice principal at New Brunswick High School. Redler is Caucasian and older than plaintiff. Plaintiff testified Johnson was younger than her and Hispanic/Latino.

NBBOE's nonrenewal policy for nontenured staff "recognizes its obligation to employ only those professional staff members best trained and equipped to meet the educational needs of the pupils of this district" and "[w]hen it appears that a teaching staff member's performance does not meet the standards of the district, the [s]uperintendent shall consider recommending to the [NBBOE] that any such member not be reemployed." Any staff member whose contract has not been renewed "may apply in writing to the [NBBOE] within fifteen days of notification for the reasons for nonrenewal" and will have "an opportunity to meet informally with the [NBBOE]." Following an "informal hearing," the NBBOE "may . . . offer the teaching staff member reemployment" but "is not required to."

A-1642-23

"The [NBBOE] may dismiss a nontenured teaching staff member when dismissal is in the best interest of the school district." It may also "terminate a nontenured employee without notice when sufficient cause warrants."

Plaintiff was assigned to oversee the tenth grade and history department. This differed from her prior roles in other school districts because she was now overseeing an entire grade. Plaintiff testified her workload and responsibilities increased the longer she was employed with the NBBOE as she became acclimated. When she first started working, Redler "was available," "open[,]" "courteous[,] and polite." However, he was also "anxious[,]" which plaintiff thought was due to "just being principal to the high school."

Redler stated he conducted three observations, or evaluations, of nontenured vice principals during the school year. Plaintiff received evaluation summaries from Redler, which were a collective of all three of her observations. The evaluation summaries assess whether the given responsibility was "[n]ot [d]emonstrated[,]" "[d]eveloping[,]" "[p]roficient[,]" "[a]ccomplished[,]" or "[d]istinguished[,]" and then the evaluator provides a summative rating.

Beyond the evaluation summaries, Redler also evaluated the vice principals' "[j]ob performance throughout the year" and whether they were

"meeting district expectations." If improvement was needed, Redler "[g]enerally" handled that with "conversations, sometimes memos."

NBBOE Director of Human Resources, Zuleima Perez described the evaluation process like Redler. She further certified there is no NBBOE policy "that requires renewal of a non-tenured employee's contract simply because [they] received a summative rating of '[e]ffective'" on their observations or evaluation summary.

For plaintiff's first year as vice principal during the 2016-17 school year, she predominantly received marks of "[d]eveloping" for each responsibility and received a few marks of "[p]roficient" on her observations. Redler recommended she "discuss initiative[s] with the vice principals in the building" because "working in isolation can lead to confusion and misconceptions among teachers and administration," and plaintiff "must collaborate with administrators making sure [she was] not providing discipline against what has already been put in place." At the end of her first year, plaintiff received a summative rating of 2.8. This was considered effective on the rating scale, which defined effective as a score between 2.65 and 3.49. Plaintiff acknowledged her score was on the "low end," and Redler stated she had a learning curve during her first year and "required a lot of support, which was given."

5

In April 2018, plaintiff created an entry in a discipline log for a student for "[i]nappropriate [b]ehavior/[c]ontact." The entry stated a student would not leave the cafeteria after being asked and told plaintiff to "[g]et away from [her]." Plaintiff "told her I don't know who she slept with last night but she didn't wake up with me this morning," and she was being disrespectful.

Plaintiff predominantly received scores of "[d]eveloping" or "[p]roficient" in her observations for the 2017-18 school year. Redler recommended she "communicate frequently either in person or via email to pass information to [the principal]" and "work on establishing systems and procedures that minimize loss of . . . instructional time." At the end of her second year, plaintiff again received a summative rating of 2.8.

Plaintiff testified she felt her observation and evaluation scores "did not reflect the work that [she] was doing" and the summative rating of 2.8 was unfair. When asked if she felt it was unfair because she was targeted due to her race, she stated, "I feel that I was targeted. Period." When asked to explain why she felt she was targeted, plaintiff said, "I can't answer that question. I don't know. I'm not sure."

During the second half of 2018, a teacher under plaintiff's supervision told "her class that she was in support of Trump building a wall," causing students

6

from that teacher's class to inform plaintiff about the comment. Plaintiff then spoke with Redler and met with the teacher, who said she would apologize to her class. Plaintiff told the teacher that "as an agent of the school, she is to stay neutral and not share her personal feelings in regard[] to politics with the students," and gave the teacher a verbal warning. Redler testified he had no problem with the way plaintiff handled the teacher's discipline.

In December 2018, plaintiff received an "ineffective" observation score. Redler stated plaintiff "refused to sign" the observation, which resulted in him writing her up. Plaintiff later brought evidence to Redler to show she should have received a higher rating, and he changed her score for the December 2018 observation from 1.6 to around 2.64.

In January 2019, several students approached plaintiff regarding another teacher they had recorded "standing in front of the class saying I want to say the word n****r." Redler agreed the teacher should not have made the comment and confirmed she was reprimanded in writing by the vice principal who supervised the teacher.

The teacher then responded to the written reprimand and attempted to explain that a student had been playing a video "in which the presenter started to curse" and she told the student to turn the video off. According to the teacher,

"[t]hat student stated that at least it didn't say the 'n' word" and that she "ha[s] told them many times that [the] 'n' word is not appropriate and they tell [her] 'it is ok, it's not bad.'" "Thinking this would be a teachable moment," the teacher rhetorically asked "why it is not offensive for some people to say the 'n' word, while others can't? That's racist[,] isn't it?" The teacher "always believed that school was a place to discuss different views on contemporary issues."

Plaintiff felt like additional discipline was appropriate for this teacher because other teachers had been dismissed for less egregious conduct. Redler called the teacher into his office and had a conversation with her about it with a union representative, and confirmed the written reprimand would remain in her file. He testified the teacher's comment was "not appropriate, but it wasn't determined to be racially[-]motivated."

By winter 2018, plaintiff testified Redler's communication style changed and he "wasn't as available." He became "curt" and "[t]he tone in which [she] was spoken to changed" and "wasn't so polite." Plaintiff felt "a lack of communication" and "just felt . . . [l]ike there was a bias." She alleged she "was the last one to know" and the other vice principals would learn about things before she did. Plaintiff admitted that one of the vice principals knew of the scheduling changes quicker because Redler put him in charge of the guidance

A-1642-23

department, which was involved in the process. The other vice principal was the one who made the scheduling decisions and "would be aware of the changes to the schedules because she made them." Nonetheless, plaintiff claimed the female vice principal in charge of scheduling changes did not communicate with her things that she should have, including when teachers under plaintiff's supervision had schedule changes. When plaintiff brought these concerns to Redler, he informed her that he had approved the schedule changes. Plaintiff never complained to Redler concerning her belief the vice principal handling the scheduling was singling her out.

Throughout the 2018-19 school year, plaintiff complained about Redler to the third vice principal. Plaintiff asserted the third vice principal, also a female, had similar complaints regarding the failure to communicate matters in a timely manner. According to plaintiff, other teachers she supervised, and students, complained about Redler as well. Plaintiff believed Black students "were not taught or treated the same way as the other students in the building" and Redler "oversaw and allowed it to happen."

Plaintiff conceded neither Redler nor Johnson ever said anything about her that made her feel discriminated against. Although plaintiff did not complain about Johnson, she claimed some teachers "saw all people that looked

9

like they were [W]hite and no one . . . [B]lack" in the "central office[,]" where Johnson worked with his staff. Plaintiff never heard anyone from the NBBOE say anything about her that was inappropriate or discriminatory. Nonetheless, she "felt really lost and left out and not included" during the 2018-19 school year, and Redler did not support her.

Plaintiff did not report anything to human resources because she thought it "would be brought back to" Redler. She told Johnson she felt excluded and "was not comfortable[,]" but did not recall whether she told him there was bias or discrimination against her and she could not remember exactly what she told him.

Plaintiff "got the impression that [she] was thought of [as] less than" other administrators by Redler because he "seemed to [make] an effort for a way of communicating with them[,] which did not occur with [her]." Redler and others "[b]lamed [her] for things that they themselves have done[,]" "[l]eft [her] out of meetings[,]" "[d]ismissed [her] from meetings[,]" and were not "upfront with staff and decisions made with the staff that [she] supervise[d]."

When other vice principals did not want to do something, such as teacher observations, she was given their responsibilities. On the other hand, plaintiff conceded teacher observations were a team effort. She also admitted part of her

job duties as vice principal included "complet[ing] additional assignments as directed by the principal." Redler confirmed this when he testified "all vice principals were treated equally, . . . took on additional observations[,]" and worked to "catch up" in the 2018-19 school year. Plaintiff was invited to all administrator team meetings and was "never omitted from a meeting that the team was supposed to be there for."

In spring 2019, two students told plaintiff their Spanish teacher "said to them, where do you think you are, in the jungle[?]" Plaintiff spoke with five students, two of whom were Black, about this incident and they thought the teacher made the comment because they were Black. She spoke with the teacher, who claimed "[s]he said, where do you think you are, in the streets[?]" Plaintiff also spoke with Redler about this incident, but she did not make any notes in the teacher's file because she did not supervise her.

In April 2019, plaintiff had her second observation for the 2018-19 school year and received scores in the developing and proficient categories. Since plaintiff only had two observations for the 2018-19 school year, she did not receive an evaluation summary or summative rating for that year. However, Redler testified he had areas of concern regarding her performance for that school year.

11

Plaintiff oversaw advanced placement (AP) testing. She ordered the wrong material for the AP History test and did not check it until just before the test. This required the school "to call the [S]tate and make adjustments and reorder new material, which cost the district money and delayed the testing." Redler testified "several students missed instructional time as a result of [plaintiff's] poor planning when it came to [the] scheduling for testing" and she was "offering students extra credit without conferring with teachers."

Redler also stated that in front of the entire faculty, plaintiff accused child study team members "of not working through their [individualized education programs] to place [students] in classes correctly" and humiliated them by telling them they were "not doing their job." He stated the conversation should have occurred in private because employees are not publicly disciplined. The child study employees "went to their immediate supervisor and said they've never been so embarrassed in their lives." Plaintiff claimed she did not identify the child study team and only said "the adults dropped the ball."

Redler was also concerned about plaintiff's April 2018 exchange with the female student because plaintiff wrote "I didn't sleep with you last night" in the student's file, "it's written in her disciplinary report that's viewable to her parents and stays on her record." Plaintiff made a similar comment to a male student

12

who became upset and "took it as a sexual statement." When Redler investigated, two students confirmed they heard plaintiff make statements like those made to the male student. Redler issued plaintiff a verbal warning about these incidents and counseled her not to make such inappropriate statements.

Redler also criticized plaintiff when she failed to immediately report an incident involving a student who threatened to "shoot up the building." Plaintiff thought another teacher had already informed Redler.

On May 1, 2019, the vice principal handling the January 2019 incident involving video of the teacher saying the racial slur forwarded her written reprimand, the teacher's response, and the video of the incident to human resources. Plaintiff was not copied on the email. Redler did not know plaintiff was involved in the incident.

On May 9, 2019, plaintiff received a non-renewal letter of termination. Redler stated plaintiff was not renewed due to her "job performance." On June 19, 2019, Redler wrote a letter memorializing that he had given plaintiff her letter of nonrenewal on May 10, 2019. The letter cited the: child study team and AP testing incidents; poor ratings on plaintiff's December 2018 observation and her reprimand for failing to sign that observation; communication issues surrounding "programs and initiatives [plaintiff] is in charge of"; "send[ing] pre-

conference forms to the [s]ocial [s]tudies staff that was an unapproved form;" "not communicat[ing] a potential threat to the school on December 20, 2018;" and her statements to students that she had not been sleeping with them.

The third vice principal who was involved in reprimanding the teacher for using the racial slur is also Black and was not renewed after the 2018-19 school year. Redler testified that decision had nothing to do with the reprimand because he felt she handled the matter appropriately. The NBBOE also did not renew: a male teacher whom plaintiff identified as Haitian and in his thirties; a Black male teacher in his forties; and a Caucasian female teacher.

Plaintiff requested a meeting to discuss her termination with the NBBOE. There, Redler presented his reasons for plaintiff's non-renewal and plaintiff presented her case. Following the hearing, the NBBOE affirmed the nonrenewal.

Redler testified a Black male was hired to replace the third vice principal who was also not renewed, and Perez certified that person was fifty-two years old. A forty-six-year-old Hispanic female with several years of experience as a vice principal was hired to replace plaintiff.

Based on these facts, the motion judge reasoned defendants were entitled to summary judgment. He dismissed the race and age discrimination counts of

plaintiff's complaint because although she was a member of a protected group, race- and age-wise, "the record is replete with overwhelming evidence of legitimate business reasons for non-renewal." He found no evidence "any racist or ageist remarks were ever made by [p]laintiff's supervisors or the decisionmakers [nor] . . . evidence that preferential treatment was given to employees not in the same protected class as [p]laintiff."

Redler's lack of communication did not constitute discrimination because "the other [v]ice [p]rincipals and other staff share[d] similar complaints around the same time she did." Moreover, the Caucasian male vice principal also received a low observation score. The extra work given to plaintiff was not evidence of discrimination because all vice principals were required to take on extra work and the observations assigned to plaintiff were because the vice principal who had them "was busy with student scheduling."

The judge found "the mere sequence of events leading to [p]laintiff's non-renewal . . . belie[d] any inference of discriminatory animus." There was "no . . . evidence to establish a causal link between [plaintiff's] termination and her reporting" the teacher who made the comment about a border wall. The teacher's comment was reported in the second half of 2018 and plaintiff was not renewed in May 2019.

The judge noted the other employees who were not renewed were not members of plaintiff's protected class, race- or age-wise. A Caucasian male in his thirties and two Caucasian females were not renewed. A Hispanic/Latino male teacher was also not renewed. The judge concluded "[t]he fact that other staff who are not members of the same protected class as [p]laintiff were also disciplined or terminated and did not receive better treatment than [p]laintiff eviscerates her discrimination claim."

The fact the teacher who made the racial slur was not terminated did not evidence discrimination because she was not similarly situated to plaintiff. She: "did not engage in the same conduct as [p]laintiff; . . . was tenured . . . ; had no other complaints before or since the . . . incident . . . ; and [was not] an administrator." One of the vice principal positions after plaintiff was not renewed was filled by a Black person. "Moreover, the record shows . . . Redler . . . did not experience any of the same performance issues with either of the new [v]ice [p]rincipals that he had with [p]laintiff and . . . the new Black [v]ice [p]rincipal . . . remains employed by NBBOE."

The age discrimination claim did not survive because Redler and Johnson were the ones who hired plaintiff. Redler is older than plaintiff, and plaintiff was hired at fifty-three years of age and non-renewed just three years later.

A-1642-23

The judge found the NBBOE did not discriminate against plaintiff because it afforded her a hearing. There, she was able to "present her reasons for objecting to her non-renewal at a hearing in front of the full Board of Education[,] whom [p]laintiff admitted . . . was [comprised] of Black members." The fact the neutral members of the NBBOE "adopted Redler's recommendation that [p]laintiff's employment not be renewed . . . after hearing from her constitutes further evidence that the business reasons underlying [p]laintiff's non-renewal were legitimate and non-discriminatory." Indeed, "none of the actions by [d]efendants were in any way racially- or age-motivated."

The judge declined "to infer a racial overtone in every employment decision and every interaction between a supervisor and an employee of different racial background." Doing so "would permit an individual's subjective perception and reaction to determine the objective question of the decisionmaker's liability." Defendant's actions were not pretextual because "the record is overwhelming that any and all actions taken against [p]laintiff by [d]efendants were based on legitimate, non-discriminatory reasons related exclusively to [p]laintiff's poor job performance."

The judge dismissed the hostile work environment claim because there was no evidence Redler engaged in harassing conduct. Plaintiff never

complained "Redler subjected her to derogatory remarks, insults[,] or any verbal abuse." Plaintiff's claims "that her interactions with Redler changed over time, and he avoided communicating with her, ignored her, gave her increased work assignments, scrutinized her, and reprimanded her for not signing her December 2018 evaluation" was not "because of [p]laintiff's race or age[,] but for legitimate reasons."

The judge found plaintiff was not singled out because of her race or age because she admitted Redler "was still sometimes courteous." As we recounted, the other two vice principals learned of scheduling changes before plaintiff because they were charged with those tasks. "Plaintiff did not tie [the scheduling changes] to [her] age or race." She admitted her increased responsibilities were a part of the job. Plaintiff did "not allege she was assigned any task that was outside of her job responsibilities[,]" and "the other non-Black [v]ice [p]rincipal[] was assigned additional responsibilities that she was not." Therefore, there was "nothing in the record to evidence [p]laintiff was singled out in any way for extra work because she is Black or because of her age."

The reprimand plaintiff received for not signing the December 2018 evaluation was not evidence of harassment because plaintiff admitted she did not sign her observation even though she knew that signing it was merely an

18

acknowledgment that she had seen it— not that she agreed with it. Moreover, she never tried to address the reprimand with Redler, a union representative, or human resources. Therefore, even if the reprimand constituted harassment, "her subsequent lack of contemporaneous complaint or other response thereto, [did] not warrant any inference of improper motive behind it."

"Plaintiff admitted neither Redler[] nor . . . Johnson, nor anyone employed by the NBBOE ever said anything . . . she felt or viewed was inappropriate or discriminatory." The inappropriate statements were made by teachers to students, not plaintiff, and those teachers were disciplined. There was no evidence the discipline was ineffective or that there were other racist or offensive comments made by either teacher after they were disciplined.

The judge concluded the record lacked evidence of severe or pervasive harassing conduct by defendants. Aside from the incident regarding the racial slur, which was not directed at plaintiff, "there were no other racial slur incidents involving anyone." The judge noted that

> [e]ven when viewed cumulatively, the acts alleged . . .
> are insufficient to present a hostile work environment
> claim to a jury. . . . Plaintiff has not identified a single
> objectively offensive remark—let alone racist or
> ageist—made by Redler or any other supervisor, either
> in her presence, directed against her, or otherwise.

19

In sum, "no reasonable jury could conclude that [d]efendants' actions or inaction could be seen as severe, pervasive, hostile[,] or abusive" as a matter of law. Therefore, plaintiff did not establish a prima facie case of hostile work environment and there was no presumption warranted to conclude the alleged harassment occurred because of plaintiff's race or age.

The judge dismissed plaintiff's retaliation claim because she could not show she engaged in any protected activity. Although the teacher's comment regarding the border wall was "insensitive and inappropriate in a school setting, . . . [b]y her own admission, . . . [p]laintiff did not believe [it] was racist or otherwise discriminatory." There was no evidence to show defendants knew of plaintiff's involvement in the racial slur incident to establish "she was engaged in protected activity known to the employer."

Plaintiff never reported any alleged violation of the district's policies. She "never reported any perceived discrimination or retaliation against her during her employment or before the [NBBOE] at her hearing to appeal her non-renewal." There was "no temporal proximity to establish a nexus" between the border wall or the racial slur incidents and plaintiff's non-renewal. The former incident happened in 2018, the latter happened in January 2019, and plaintiff was not renewed in May 2019. Redler also had no knowledge of plaintiff's

involvement in the latter incident. Therefore, "no inference can be made that Redler's non-renewal recommendation was motivated by something he was unaware of." "Defendants had legitimate and non-retaliatory reasons for not renewing" plaintiff.

The judge dismissed all of plaintiff's claims against Johnson because "there is nothing in the record which provides a plausible basis for such liability." Nothing showed Johnson encouraged or facilitated any aspect of the alleged harassment by Redler, was present for it, or could foresee or prevent it to ascribe liability to him under an aiding and abetting theory.

The judge dismissed the punitive damages claim because plaintiff did not establish a prima facie case of discrimination. He concluded "no facts to warrant punitive damages in this case."

## I.

Plaintiff argues summary judgment should not have been granted because her deposition was not concluded, and the record was incomplete. We are unpersuaded.

Plaintiff filed her complaint on December 1, 2020, and the matter was joined when defendants answered the complaint on February 11, 2021. Discovery in this case was extended three times; first by consent on April 8,

2022, by which discovery was extended to July 6, 2022; then by court order on July 5, 2022, whereby discovery was extended for 177 days; and then by way of a consent order prepared and submitted by plaintiff's counsel on September 27, 2022, which the court entered on September 29, 2022, extending discovery to February 28, 2022.

In the meantime, plaintiff's deposition occurred on August 17, 2022, but her attorney ended it early because she did not anticipate it lasting so long and late into the day. The September 2022 consent order made no mention of continuing plaintiff's deposition.

In October 2022 defendants moved to compel discovery, and plaintiff cross-moved for discovery as well. The court granted defendants' motion and granted plaintiff's motion in part. Plaintiff's motion made no mention of continuing her deposition. Defendant moved to extend discovery on November 30, 2022. On December 8, 2022, for the first time, plaintiff cross-moved and asked the court to compel her own deposition.

The cross-motion was premised on plaintiff's assertion her attorney was unable to conduct "redirect questioning, [because the deposition transcript] lack[ed] balance and elaboration [and] . . . to provide context to [plaintiff's] testimony and . . . further support the claims made in this litigation." On

22

December 16, 2022, the judge granted defendants' motion to extend discovery until March 31, 2023, but denied plaintiff's cross-motion to continue her deposition. Plaintiff did not challenge the December 16 order and thereafter discovery closed, and defendants moved for summary judgment.

Preliminarily, we note neither plaintiff's notice of appeal, nor her appellate case information statement, list the December 16 order as subject to this appeal. "[W]e review 'only the judgment or orders designated in the notice of appeal.'" Kornbleuth v. Westover, 241 N.J. 289, 299-300 (2020) (quoting 1266 Apartment Corp. v. New Horizon Deli, Inc., 368 N.J. Super. 456, 459 (App. Div. 2004)).

The December 16 order noted the judge had placed his findings of fact and conclusions of law on the record on that date. Plaintiff has not provided us with a copy of the transcript containing the judge's findings as required by Rule 2:5-3(b).

Notwithstanding these omissions, we are satisfied the completion of plaintiff's deposition was not an impediment to deciding the summary judgment motion. Generally, "[i]t is 'inappropriate' to grant summary judgment when discovery is incomplete and 'critical facts are peculiarly within the moving party's knowledge.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting James v. Bessemer Processing Co., 155 N.J. 279, 311 (1998)). However,

"'summary judgment is not premature merely because discovery has not been completed, unless' the non-moving party can show 'with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action.'" Ibid. (quoting Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015)). Although "summary judgment should be withheld until completion of discovery, . . . discovery need not be undertaken or completed if it will patently not change the outcome." Minoia v. Kushner, 365 N.J. Super. 304, 307 (App. Div. 2004).

Plaintiff has not shown how the redirect examination would change the result in any way. The record fully explicates the facts related to plaintiff's discrimination claims. Regardless of her deposition, plaintiff was able to certify to the facts in her opposition to summary judgment and could have filed an amended affidavit before the court adjudicated summary judgment.

II.

Plaintiff asserts the court improperly weighed the evidence in deciding the summary judgment motion and adopted defendants' position while discounting hers, which evidenced a bias against her. She argues she established a prima facie case for all the claims in her complaint.

We review a decision on summary judgment de novo and apply the same standard as the motion judge. Meade v. Twp. of Livingston, 249 N.J. 310, 326-27 (2021). This requires us to view the facts in the light most favorable to the non-moving party. DiProspero v. Penn, 183 N.J. 477, 482 (2005). On summary judgment, "[t]he court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Meade, 249 N.J. at 327 (quoting Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021)). If "the evidence 'is so one-sided that one party must prevail as a matter of law,'" summary judgment is proper. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

## A.

The LAD prohibits an employer from discriminating based on race and age. N.J.S.A. 10:5-12(a). The statute follows the procedural burden shifting analysis in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Tisby v. Camden Cnty. Corr. Facility, 448 N.J. Super. 241, 248 (App. Div. 2017) (quoting Zive v. Stanley Roberts, Inc., 182 N.J. 436, 447 (2005)). The burden-shifting paradigm first requires the plaintiff to demonstrate a prima facie case of

unlawful discrimination.  Ibid. (citing Victor v. State, 203 N.J. 383, 408 (2010)).

A prima facie case is made by showing:

> (1) plaintiff belongs to a protected class; (2) [they were] performing [their] job at a level that met [their] employer's legitimate expectations; (3) [they] suffered an adverse employment action; and (4) others not within the protected class did not suffer similar adverse employment actions.
>
> [Ibid. (quoting El-Sioufi v. St. Peter's Univ. Hosp., 382 N.J. Super. 145, 167 (App. Div. 2005)).]

As regards the second prong of the prima facie case, "[a]ll that is necessary is that the plaintiff produce evidence showing that [they were] actually performing the job prior to the termination." Zive, 182 N.J. at 454. "[E]ven if a plaintiff candidly acknowledges . . . that some performance issues have arisen, so long as [they] adduce[] evidence that [they] ha[ve], in fact, performed in the position up to the time of termination, the slight burden of the second prong is satisfied." Id. at 455.

Once a plaintiff presents a prima facie case, "an 'inference of discrimination' is created." Tisby, 448 N.J. Super. at 248 (quoting Zive, 182 N.J. at 449). An employer can rebut the inference "by articulating a 'legitimate, nondiscriminatory reason for the employer's action.'" Id. at 248-49 (quoting Zive, 182 N.J. at 449). Where an employer does so, the burden "shifts back to

26

the employee to prove the reason provided by the employer is 'merely a pretext for discrimination and not the true reason for the employment decision.'" Id. at 249 (quoting Zive, 182 N.J. at 449).

A plaintiff can prove pretext by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Zive, 182 N.J. at 455-56 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)). An employer "is entitled to summary judgment if [a] plaintiff is unsuccessful in this last step." Tisby, 448 N.J. Super. at 249 (citing Zive, 182 N.J. at 456).

"The fourth element of a prima facie case in an age-discrimination [claim] properly focuses . . . on 'whether the plaintiff has established a logical reason to believe that the decision [for termination] rests on a legally forbidden ground.'" Bergen Com. Bank v. Sisler, 157 N.J. 188, 213 (1999) (quoting Murphy v. Milwaukee Area Tech. Coll., 976 F. Supp. 1212, 1217 (E.D. Wis. 1997)). Therefore, a plaintiff must demonstrate they were "replaced with 'a candidate sufficiently younger to permit an inference of age discrimination.'" Ibid.

A-1642-23

(quoting Kelly v. Bally's Grand, Inc., 285 N.J. Super. 422, 429 (App. Div. 1995)).

Pursuant to our de novo review of the record, we conclude the motion judge properly dismissed plaintiffs' age- and race-discrimination claims. Assuming plaintiff established a prima facie case of discrimination, the record simply does not support the conclusion defendants had anything other than a legitimate, non-discriminatory reason for not renewing her contract. Indeed, the record is replete with valid business reasons why defendants parted ways with plaintiff. Plaintiff has not demonstrated defendants did not renew her based on a pretextual reason. We affirm the dismissal of the age- and race-discrimination claims for the reasons expressed by the motion judge. Plaintiff's claims simply did not survive the burden shifting analysis.

B.

To establish a claim of hostile work environment under the LAD, a plaintiff must show that the complained-of conduct: "(1) would not have occurred but for the employee's [protected status]; and it was (2) severe or pervasive enough to make a (3) reasonable [person] believe that (4) the conditions of employment [were] altered and the working environment [was] hostile or abusive." Lehmann v. Toys 'R' Us, Inc., 132 N.J. 587, 603-04 (1993)

(emphasis omitted). Remarks by supervisors regarding a protected attribute suggest a hostile work environment. Taylor v. Metzger, 152 N.J. 490, 502-03 (1998).

"A single comment, if sufficiently severe, may be enough to create a hostile work[] environment." El-Sioufi, 382 N.J. Super. at 179. However, this is only the case when the comment is "an outrageous and offensive statement made by a supervisor directly to the complaining subordinate." Ibid.

Appellate courts apply "an objective standard to evaluate a hostile work environment claim." Rios, 247 N.J. at 12 (citing Cutler v. Dorn, 196 N.J. 419, 431 (2008)). "The standard focuses on the harassing conduct itself and 'not its effect on the plaintiff or on the work environment.'" Ibid. (quoting Lehmann, 132 N.J. at 606). Thus, "neither 'a plaintiff's subjective response' to the harassment, . . . nor a defendant's subjective intent when perpetrating the harassment . . . is controlling of whether an actionable hostile environment claim exists." Cutler, 196 N.J. at 431 (quoting Lehmann, 132 N.J. at 604-05, 613).

Any hostile work environment claim "must be evaluated in light of 'all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

performance.'" Rios, 247 N.J. at 10-11 (quoting Cutler, 196 N.J. at 432). To determine whether conduct is sufficiently severe or pervasive, "courts must consider the cumulative effect of the various incidents, bearing in mind that each successive episode has its predecessors, that the impact of the separate incidents may accumulate, and that the work environment created may exceed the sum of the individual episodes." Id. at 11 (quoting Lehmann, 132 N.J. at 607).

The record lacks any evidence defendants engaged in severe or pervasive discriminatory conduct, let alone a single utterance directed at plaintiff that could constitute a hostile work environment. All the incidents of problematic behavior were undertaken by plaintiff's subordinates, not directed at plaintiff, and promptly handled by plaintiff or the persons in charge of the teachers who made the remarks. Beyond these incidents, there is no evidence Redler or any defendant reprimanded plaintiff in an unprofessional manner or based on her protected traits. Redler's attempts to correct plaintiff's performance fell well within his authority as granted by the NBBOE's policies and his role as her supervisor. Further, his interactions with plaintiff as compared to the other vice principals evince no mistreatment of plaintiff in a manner that could be remotely characterized as creating a hostile work environment. Plaintiff's impressions were subjective and there is simply not enough to establish a prima facie claim.

C.

The LAD prohibits retaliation against any person

> because that person has opposed any practices or acts forbidden under this act or because that person has . . . filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act.
>
> [N.J.S.A. 10:5-12(d).]

To establish a prima facie case of retaliation, a plaintiff must demonstrate: "(1) that [they] engaged in [a] protected activity; (2) the activity was known to the employer; (3) [the] plaintiff suffered an adverse employment decision; and (4) there existed a causal link between the protected activity and the adverse employment action." Young v. Hobart W. Grp., 385 N.J. Super. 448, 465 (App. Div. 2005) (citing Craig v. Suburban Cablevision, 140 N.J. 623, 629-30 (1995)). "Once [the] plaintiff establishes a prima facie case of retaliation, the defendant[] must 'articulate a legitimate, non-retaliatory reason for the decision.'" Ibid. (quoting Romano v. Brown & Williamson Tobacco Corp., 284 N.J. Super. 543, 549 (App. Div. 1995)).

As a final step, the plaintiff must demonstrate a discriminatory motive and show the employer's stated reason was merely a pretext for discrimination. See

31

<u>Young</u>, 385 N.J. Super. at 465; <u>see also</u> <u>Romano</u>, 284 N.J. Super. at 549. Relevant factors include "the employee's loss of status, a clouding of job responsibilities, diminution in authority, disadvantageous transfers or assignments, and toleration of harassment by other employees[,]" as well as "assignment to different or less desirable tasks." <u>Mancini v. Twp. of Teaneck</u>, 349 N.J. Super. 527, 564 (App. Div. 2002).

"Although the burden of production shifts throughout the process, the employee at all phases retains the burden of proof that the adverse employment action was caused by purposeful or intentional discrimination." <u>Sisler</u>, 157 N.J. at 211 (citing <u>Texas Dep't of Cmty. Affs. v. Burdine</u>, 450 U.S. 248, 256 (1981)). If the plaintiff fails this last step, summary judgment in the employer's favor is required. <u>Tisby</u>, 448 N.J. Super. at 249.

The record does not support a retaliation claim because it is devoid of any evidence plaintiff was engaged in a protected activity that defendants knew about, which they then responded to by not renewing her. In addition to the lack of facts supporting the first three prongs of a retaliation claim, there was ample evidence supporting defendants' valid business reasons for not renewing plaintiff. Therefore, the record also lacked the necessary causal link to establish a prima facie case for retaliation.

32

D.

"[I]ndividual liability of a supervisor for acts of discrimination or for creating or maintaining a hostile environment can only arise through the 'aiding and abetting' mechanism that applies to 'any person.'" Cicchetti v. Morris Cnty. Sheriff's Off., 194 N.J. 563, 594 (2008) (quoting N.J.S.A. 10:5-12(e)).  Under the LAD, "aiding and abetting 'require[s] active and purposeful conduct.'" Ibid. (quoting Tarr v. Ciasulli, 181 N.J. 70, 83 (2004)).  Therefore,

> in order to hold an employee liable as an aider or abettor, a plaintiff must show that "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of [their] role as part of an overall illegal or tortious activity at the time that [they] provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation."
>
> [Ibid. (quoting Tarr, 181 N.J. at 84) (third alteration in original).]

As defendants did not undertake a wrongful act to begin with, Johnson could not be liable for aiding and abetting.  The racial composition of Johnson's office had nothing to do with the fact neither he nor the other defendants engaged in conduct that could constitute discrimination or creating a hostile work environment.

A-1642-23

E.

Finally, as there was not a triable issue of fact regarding the LAD claims, plaintiff could not pursue her punitive damages claim. The remaining claims plaintiff raises on appeal, including her claim the motion judge weighed the evidence, how he weighed the evidence, and that he was biased, lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

34

A-1642-23